THE TIDE-WATER PIPE COMPANY, A LIMITED PARTNER-SHIP ASSOCIATION, PLAINTIFF-RESPONDENT, v. BLAIR HOLDING COMPANY, INC., A CORPORATION, AND RE-PUBLIC WIRE CORPORATION, A CORPORATION, DE-FENDANTS-APPELLANTS.

Argued April 7, 1964—Decided July 7, 1964.

592

*Mr. Joseph Schoenholz* argued the cause for defendants-appellants.

*Mr. William P. Reiss* argued the cause for plaintiff-respondent (*Messrs. Pitney, Hardin & Kipp,* attorneys).

The opinion of the court was delivered by

HALL, J. The prime question in this case is whether the owner of the land through which a petroleum pipeline easement runs may erect a building over the line. The Chancery Division, in the easement holder's suit to enjoin construction

of the building, held that the landowner had no such right. Defendants' appeal is here by reason of certification granted on their application while the matter was pending unheard in the Appellate Division. *R. R.* 1:10–1A.[1]

The property involved is a somewhat irregularly shaped tract of land, having an average depth of approximately 1,800 feet and a frontage of about 500 feet on the westerly side of Blair Road, a north-south highway in that section of the Township of Woodbridge near the boundary of the Borough of Carteret.

Plaintiff's easement derives from a recorded instrument executed in 1914 on a printed form, prepared by plaintiff, with blanks filled in, wherein Carteret Realty Co. for a consideration of $750, made the following grant:

"* * * to The Tide-Water Pipe Company, Limited, its heirs, successors and assigns, a right of way upon and through our lands lying in Woodbridge Township, Middlesex County, State of New Jersey, and described below, for the purpose of constructing from time to time, two lines of iron pipe for the transportation of petroleum, in such manner as said grantee may deem necessary, and with free ingress and egress, to construct, operate, repair, replace, maintain, and from time to time alter and remove the same in such manner as it may desire.

Provided, that said pipe or pipes shall be so laid as not to interfere with the usual cultivation of the premises nor with any buildings thereon—and that all actual damage done to crops, timber or otherwise, by the construction or operation of said pipe lines shall be paid for in full by the said grantee.

\*     \*     \*     \*     \*     \*     \*     \*

And that the said grantors shall fully enjoy the said premises except for the purposes hereinbefore specified."

The description of the lands (the parcel now owned by defendants) was set forth in the last paragraph of the instrument:

---

[1] Defendant Blair Holding Company, Inc. is the owner of the premises in question. Defendant Republic Wire Corporation operates the wire drawing business conducted thereon. The corporations have common officers and stock ownership. While they will be referred to in the plural without differentiation, the issues presented are properly, and will be, dealt with as if the landowner were the only defendant.

"Bounded on the north by J. Toth, Lands of P.R.R. Co. and others, East by the Blair road, on the south by New Jersey Terminal Railroad and on the west by said R.R."

There must have been some question as to the fee ownership of the tract at the time this grant was given, for another instrument, dated March 15, 1915, about four months after the first, is found on record. It is identical with the earlier one except that the recited consideration is $1, the grantor is Edward S. Savage, and the following language appears after the description:

"Being same lands for which the Carteret Realty Co. gave a right of way, for said pipe lines but which land is now owned by E. S. Savage. Said pipe lines to be operated and maintained where they are now located."

The two parallel pipelines were installed either just before or just after the second grant since a survey in evidence made for plaintiff under date of January 4, 1915 plots their course. The final sentence quoted from the second grant establishes that the grantor knew and agreed to their intended or actual location, as shown on the survey or in the ground in accordance therewith, and that plaintiff, by accepting this grant, acknowledged that it could not change that location, at least to any substantial degree, without the landowner's consent. The lines as actually installed ran, probably in a straight line, for a distance of slightly over 500 feet in a southwesterly direction from a point on Blair Road about 100 feet south of the northeasterly corner of the tract to a point in the southerly line thereof about 400 feet west of the southeasterly corner, where they crossed under the tracks of New Jersey Terminal Railroad (now Jersey Central lines) which ran in an east-west direction south of and parallel to the southerly line of the tract. At the time the grant was given, the tract was vacant and unimproved. A good part of it was heavily wooded and the rear portion was swampy. The latter condition still exists. Other lands in the area were generally in the same undeveloped state or being used for agricultural purposes.

It is unlikely anyone even dreamed at that date of the vast industrial and commercial development which would take place in this general section during the next few decades.

For many years the lines were used to transport crude oil as a common carrier from fields in western Pennsylvania and, by connecting lines, from those in the midwest and southwest to refineries in Bayonne as well as, during some periods, to carry crude oil brought to the Atlantic seaboard by tanker to refineries in other parts. Since 1954 the use has been confined to the transportation of No. 2 fuel oil from Linden to points west. This gives rise to defendants' second principal point—that the easement is limited to the transmission of crude oil by reason of the use of the word "petroleum" in the grant. By counterclaim they sought to enjoin plaintiff from any other use. The trial court denied this relief holding that "petroleum" is a sufficiently generic term and at least should not prevent use of the lines to carry fuel oil, a product of petroleum less hazardous than the substance in its crude form.

Apparently a small factory of some kind was built somewhere along the frontage of the tract about 1920. By 1937 two commercial or industrial buildings, which still remain and are used by defendants, had been erected parallel to each other, near the southeasterly corner and generally east of the pipelines. A railroad siding was brought in between the buildings. It is probable that the lines were relocated a few feet westerly at that time to clear the northwesterly corner of the northerly of the two structures and that the lines were encased for the distance that the railroad siding passed over them, under arrangements not clear. It is also probable that between 1915 and 1957 some other slight relocations of the lines took place in other parts of the premises in the course of repairs, reconditioning or replacement of pipe.

Defendants acquired the property in 1957 with actual notice of the easement and the location of the lines. Immediately thereafter they decided to erect a small addition to the northerly building a corner of which would encroach upon the lines. Upon defendants' request, plaintiff agreed to move

the lines slightly westerly at the corner and the cost was shared on a basis agreed upon by negotiation.

In the latter part of 1961 defendants decided to construct a large addition to the northerly building which would extend about 100 feet beyond the lines and would cover them for its entire 90-foot width. They suggested complete relocation of the lines on a new right of way along Blair Road just inside the property to the southeasterly corner and then westerly within and along the southerly boundary to the point where the present lines crossed under the Terminal Railroad tracks. Plaintiff was willing to make the change if defendants would bear the entire cost. Apparently defendants also proposed erecting the building over the present lines but encasing them thereunder at their expense. Plaintiff would not agree to this method and defendants were unwilling to pay the full cost of relocation around the east-south perimeter. Relocation west of the addition was not also suggested by defendants at the time, although physically feasible and agreeable to plaintiff if defendants paid the cost, since they contemplated the possibility of building further in that direction in the future. Negotiations broke down. Defendants took the position that they had a legal right to build over the lines and decided to proceed with construction of the building accordingly and encasement of the pipes under it.

This precipitated the instant suit to enjoin the construction. An *ex parte* restraint was dissolved on the return day and an interlocutory injunction denied. (Defendants' application for a similar restraint against the transportation of fuel oil in the lines was also denied.) Thereafter, pending trial of the case on the basic issues of defendants' right to build over the lines[2] and plaintiff's right to transport other

2 Defendants throughout the trial stood on the single proposition of absolute right to build over the lines if they encased the pipe laid under the building. In view of the second instrument, there could be no contention made of any right of a landowner to compel relocation on his property of a pipeline easement, at the expense of the easement holder, where the route was originally selected unilaterally by the latter

than crude oil through them, defendants completed the building construction and the action was translated into one for a mandatory injunction to compel removal thereof. They necessarily admitted at argument of this appeal that they built at their peril. For some reason, immaterial here, it proved impossible for defendants to encase the existing lines, so they installed two new parallel encased lines under the addition which they intended plaintiff should be required to tie into and use if it lost the suit.[3]

Mention should be made at this point of the technique of encasement, as disclosed by the evidence and the trial judge's findings. Involved is the placing of the carrier pipe within another pipe of larger diameter, with air space between, used in passage of a line under roads and railroads. The practical difficulty resulting from encasement is that, as the trial court found, it is considerably more of a burden upon the easement holder, in time and money, to repair an encased line

and the location was unreasonable at the time insofar as the owner's then or future use of his property was concerned. They did not tender, though they could have, and so there is not involved, the issue of the right of a landowner to compel relocation, where the original route selection by the easement holder was reasonable or agreed upon by the parties, in order to enable improvement of the property consistent with future area growth and development, and if there is such a right, the matter of where the line should be relocated and how the cost thereof should be borne. It may be noted that plaintiff conceded at oral argument the existence of such a right where the original grant did not specifically locate the easement and the location was not thereafter agreed upon, but at the full cost of the landowner. We express no opinion on the matter of cost under such a state of fact or whether the right also extends to the situation where the exact location of the easement is fixed by a writing or agreement and, if so, the incidents of cost and relocation.

[3] Defendants also sought recovery by their amended counterclaim of the difference between the $5500 they paid a contractor to lay the two new encased lines and the estimated cost of encasing the original lines on the theory that conduct of plaintiff required them to pursue the former more expensive course. Consonant with the trial court's holding that defendants had no right to build over the lines, it also denied them recovery of such damages without going into the merits of the contention.

in case of a leak or other pipe difficulty in that portion. When the line is not encased (and there is no building, road or the like above it), repairs may be quickly and cheaply made by "straight-down digging" at the easily discovered site of the leak and correction frequently accomplished without cutting or removing a section of the continuous, welded line or, at least, by cutting out only a small segment. Contrawise, where the pipe is encased, the nature of the surface use obviously precludes "straight-down digging" and even if such digging were possible, the presence of the encasing pipe would itself prevent "in-the-ditch" repair of the carrier pipe. So the line must be entirely shut down, the carrier pipe cut at both ends of the encasement, the portion within the encasement completely pulled out by heavy equipment into another area which must be left vacant for that purpose, repairs there made and the whole length then reinserted and reconnected. This takes days as against hours, thousands of dollars instead of hundreds. The technique and its difficulties are unavoidable where the line cannot be routed so as not to run under highways and railroads because there is no other way to provide for repair of pipe laid under them. The substantial added burden can be avoided as to buildings by routing a line away from them, a practice which the evidence showed is the almost universal practice of pipeline companies (except in a rare instance or two where for some reason a company was willing to allow a structure over its line).

The trial was lengthy and hard fought with much evidence by both sides on aspects actually having little to do with resolution of the relatively simple basic issue of a landowner's legal right to build over pipelines. The trial judge approached the determination of that question from the broad aspect, viewed in the light of the language of this particular easement, and concluded that "* * * the property owner does not have an absolute right to erect a building over a pipeline easement, and that such erection of a building constitutes an invasion of the free right of access to the easement." Most equitably, he gave defendants the alternative of removing the

building or paying the cost of relocating the lines on the thesis that they had gone ahead on their own with construction of the $50,000 addition during the pendency of the litigation, their position had been found to be wrong and they had lost their gamble.[4] He left to counsel to work out together, for ultimate inclusion in the judgment, the relocation options to be afforded and the detailed mechanics of exercise thereof and construction and payment thereunder. Agreement thereon proved impossible and the court was called upon to adjudicate most of the precise terms of the relocation alternative.

Since defendants urge here a vague, 13-line point captioned "The entry of the judgment below without taking evidence and controlling the alternatives was wrong" and further seem to contend that they are prejudiced on this appeal by the action of the Appellate Division in ordering a stay of the judgment pending appeal only on condition that one of the two alternative relocation routes set forth in the judgment be effectuated at once, we should make some further reference to the terms of the judgment and to subsequent proceedings in order that these contentions may be disposed of at this point. We are satisfied that both are without merit.

As has been said, prior to the institution of suit defendants were interested only in relocation around the east-south (front) perimeter of their property. In colloquy between court and counsel, at the conclusion of the court's oral opinion, discussing the matter of relocation routes to be incorporated in the judgment, defendants' counsel inquired whether there might be included an option of relocation further west

---

[4] The trial court, in affording an alternative remedy in the circumstances, was apparently applying the doctrine of relative hardship or a principle akin to it. See *Gilpin v. Jacob Ellis Realties, Inc.*, 47 *N. J. Super.* 26 (*App. Div.* 1957), favorably commented upon in Pinsky, "Real Property," 15 *Rutgers L. Rev.* 276, 293 (1961). Defendants' counsel conceded, at the hearing to settle the form of the judgment: "There is no question that your Honor can impose conditions alternative to tearing the building down, and that those conditions are virtually unlimited."

and to the rear of the new building addition. The proposed form of judgment submitted by plaintiff's counsel gave defendants the option of choosing either the front route (estimated to cost about $11,000) or the rear route (estimated to cost about $9,000) and the judgment as signed so provided. At the hearing on settlement of the judgment, plaintiff's counsel indicated that they were no longer interested in the front route. At no time, including their present briefs, have defendants suggested that there were other alternative routes or methods that should be considered or that either of those included in the judgment was an improper location or sought to offer evidence on the matter. Indeed, it is clear that everyone assumed the general relocation route options afforded defendants were the only feasible, if not the only possible, alternatives to building removal. The quarrel on the form of the judgment related rather to the detailed mechanics of selection of one of the options by defendants and the practical effectuation of that choice.

In broad summary, the alternative in the judgment to removal of the building gave defendants 20 days to select one of the two relocation routes, the written choice to be accompanied by a $20,000 surety bond (later changed to a letter of credit) conditioned on payment by defendants of the reasonable cost of the work, including new pipe, to be actually done by plaintiff. Defendants were also to obtain and deliver to plaintiff a new easement grant specifically covering the new route, with subordinations by lienholders and a title insurance policy. Actual payment was to be made by defendants after the work was completed and plaintiff had rendered them an itemized statement. Provision was made for court determination of the cost defendants were to pay in the event of dispute as to the propriety thereof. After such payment, plaintiff was to deliver to defendants a release of the old easement and a bill of sale for those portions of the old pipelines no longer to be used by reason of the relocation.

Defendants do not now point out any of these detailed provisions as improper or why. The unenlarged upon, broad state-

ment in their brief that "[t]he options in the judgment of the court are drastic and punitive in the extreme" is not meaningful and, in any event, we see nothing improper about them under the circumstances.

Immediately after entry of the judgment, defendants moved before the trial judge for a complete stay thereof pending appeal. Although conceding it to be unwise to continue use of the unencased pipe under the building, they urged that plaintiff should be required to tie into and use the encased lines they had constructed during the suit, *i. e.,* to force plaintiff to accede to their position which the court had held was an untenable one, but on the thesis that this was the only way to preserve the subject of the appeal. Obviously this was a case where the *status quo* at the time of institution of suit could not be preserved pending appeal. This would require removal of the building constructed by defendants at their peril during the litigation, which was also one of the subjects, so to speak, of the appeal. The trial judge properly considered that it was additionally unwise to require use of the encased lines not only by reason of difficulties of repair but further because of grave problems of liability to third parties by both plaintiff and defendants should any mishap occur as a result of such use. He denied any stay.

Defendants then applied to the Appellate Division and, though no transcript of the argument is available, we assume from the papers submitted that defendants' positions and the considerations before the court were substantially the same. It has to be further assumed in view of past conduct that defendants were only interested in selection of the rear relocation if they lost their appeal and that the court so understood. The Appellate Division, in what we consider to be an appropriate exercise of discretion relative to a stay in this unusual and difficult situation, allowed, in effect, a stay of any requirement of actual payment by plaintiff but refused any suspension of construction and use by plaintiff of the rear relocation and required defendants to furnish the specified security, new easement grant, subordinations, etc., with the

matter of ultimate assessment of cost to "be subject to such modification, if any, as this Court may determine on defendants' appeal." Our court denied defendants leave to appeal interlocutorily from this Appellate Division order. We understand that sometime thereafter the lines were relocated in the rear of the building by plaintiff pursuant to the Appellate Division order and that they are now in use.

Defendants say this was prejudicially wrong because, even if they win this appeal, their property would be saddled with another easement (even though not at their expense), the right of plaintiff to which would have been denied by the decision on the appeal. But we think the Appellate Division was simply saying that if defendants won the appeal, plaintiff would have to tear up the relocated lines, restore the physical and legal situation to what it was at the moment before the entry of the trial court judgment at no cost to defendants, and use the encased lines under the building. On this basis, defendants would not suffer any appreciable harm in the end. However, the matter is really academic for we are firmly convinced that the trial court was eminently correct in deciding that defendants had no right to erect a building over plaintiff's lines.

While the precise question is one of novel impression in this State, we think our conclusion is clearly dictated by the application of well established legal principles to the factual pattern present. On this phase of the case, we are dealing with a situation where the *landowner* claims rights to use that portion of his property encompassed within the easement under the qualification in the grant that the "grantors shall fully enjoy the said premises except for the purposes hereinbefore specified" (as distinct from one in which the *easement holder* seeks to change or enlarge the use and rights bestowed upon him by the instrument) and where the landowner's claim is resisted on the ground that his proposed use amounts to an unreasonable interference with the easement holder's rights conferred by the easement.

What the easement holder's rights are, *vis-a-vis* the landowner, depends first of all on the intent of the parties as expressed in the language of the grant, viewed in the light of the nature and reasonably necessary incidents of the permitted use—here a petroleum pipeline.[5] At this point we may interpolate the words of Professor Powell: "The resulting congeries of privileges had by [an easement holder] takes its basic framework from the kind of easement in question * * *." 3 *Powell, The Law of Real Property* § 414, *p.* 457 (1952). Where the language of the instrument so viewed does not settle the matter completely—and it rarely does in a litigated situation, else there would be no law suit—the question becomes a mixed one of law and fact to be determined within the framework of the universally accepted principle of easement law that the landowner may not, without the consent of the easement holder, unreasonably interfere with the latter's rights or change the character of the easement so as to make the use thereof significantly more difficult or burdensome. *Johnston v. Hyde,* 33 *N. J. Eq.* 632, 648–649 (*E. & A.* 1881); *Manning v. Port Reading R. R. Co.,* 54 *N. J. Eq.* 46 (*Ch.* 1895); *Ingling v. Public Service Electric & Gas Co.,* 10 *N. J. Super.* 1 (*App. Div.* 1950); 2 *Thompson, Real Property* § 427 (1961 *repl.*). Equally well recognized is the corollary principle that there is, arising out of every easement, an implied right to do what is reasonably necessary for its complete enjoyment, that right to be exercised, however, in such reasonable manner as to avoid unnecessary increases in the burden upon the landowner. *Lidgerwood Estates, Inc. v. Public Service Electric and Gas Co.,* 113 *N. J. Eq.* 403 (*Ch.* 1933).

---

[5] This is, of course, not the more common situation of an easement over the property of one owner for the benefit of the lands of another, so the usual servient tenement-dominant tenement nomenclature is not strictly apt.

Perhaps it should also be noted that since 1918 pipeline companies have been empowered in this State to "* * * acquire by condemnation land and other property necessary for public use for right of way * * *." *R. S.* 48:10–1. See also *L.* 1962, *c.* 198, §§ 48 and 49, *N. J. S. A.* 48:3–17.6 and 17.7.

We must then first look to the grant itself. Where the meaning is plain, as derived from the language read as an entirety and in the light of the surrounding circumstances, it will control without resort to artificial rules of construction. *Hammett v. Rosensohn*, 26 *N. J.* 415, 423 (1958). Here that meaning is plain enough, as far as it goes, and abstract principles of interpretation are of no appreciable help beyond that point. Plaintiff is granted two sets of rights. The first is a right of way to lay initially two lines of pipe through the grantor's property on a route to be selected by plaintiff, "in such manner as said grantee may deem necessary," and thereafter to transport petroleum through them forever. The second is to have free right of ingress and egress upon and across the property "to construct, operate, repair, replace, maintain and from time to time alter and remove the same in such manner as it may desire." The last phrase clearly relates to all of the preceding verbs. The second set of rights obviously is in aid of the first, but it is certainly an essential part of the grant. Defendants' argument to the contrary, *i. e.*, that it is only incidental to the purpose of the easement, and therefore only preventing them from interfering with the transportation of petroleum through the pipes, is a misconception and affords no basis for a claim of right to build over the lines.

It is apparent that the *grant* of rights is not only plain, but broad, particularly in reposing in the plaintiff the decision as to the manner or method to be used in laying, repairing or replacing the pipes. Since burial of the pipes in the ground as here done is obviously one method of construction contemplated and allowed, it has to follow that it was equally the intent that plaintiff should have the right to dig up the ground in the easement strip in some fashion to repair or replace them. While this language leans strongly in plaintiff's favor, it is nonetheless subject to another element of the law of easements which is really a more specific adaptation of the corollary principle previously mentioned, *viz.*, in order that the easement use shall not unreasonably interfere with the use

of, or increase the burden upon, the landowner (beyond that expressly dictated by the instrument), it shall be exercised, not in a manner determined by mere convenience of the easement holder, but only in that way which is reasonably necessary for its full enjoyment. *Lidgerwood Estates, Inc. v. Public Service Electric and Gas Co., supra* (113 *N. J. Eq.* 403).

The instrument goes on to make two express qualifications of the rights granted: one, the pipes "shall be so laid as not to interfere with the usual cultivation of the premises nor with any buildings thereon"; and two "the grantors shall fully enjoy the said premises except for the purposes hereinbefore specified." Assuming that "premises" includes the strip in which the pipes are laid as well as the remainder of the property, the landowner's exercise of this reserved right is, of course, subject to the general principle earlier set forth that he may not unreasonably interfere with the easement holder's rights or make the latter's use significantly more difficult or burdensome. Neither the first nor second qualifications can be read expressly to permit the erection of a building over the lines; by the same token, they contain no express prohibition. We think the first one must be read to go no further than to state the intent that, since no specific route for the lines was delineated in the grant, the original path chosen should avoid, and the construction and later operation should not interfere with, any buildings on the land at the time construction is commenced. We do not believe it can be reasonably construed, in the light of the balance of the instrument and all the surrounding circumstances, to imply a right to erect a building over the line subsequently. The remainder of this first qualification relating to cultivation of the soil seems clearly to indicate an entirely consistent right in the landowner to cultivate and raise crops on the land above the lines since it goes on to provide that "all actual damage done to crops, timber or otherwise, by the construction *or operation* of said pipelines shall be paid for in full by said grantee." (Emphasis added) There the parties ap-

pear to be saying that if the landowner exercises the express right reserved to him to cultivate the easement strip, the plaintiff still has the right to excavate to repair the pipes despite the cultivation at the point, but must pay for the damage to the crops occasioned thereby. This provision could hardly be sensibly applied with respect to a building constructed over the lines.

The matter of defendants' right to build over the line, thereby barring repair or replacement of the pipes by "straight-down digging," therefore boils down to whether that method of repair is reasonably necessary for the full enjoyment of the easement or only for the mere convenience of its holder. The query may be put in another way: May the defendants here impose a method of repair on plaintiff which, though physically possible, is considerably more burdensome to it? The question of reasonable necessity versus convenience is a question of fact and we see no reason to disagree with the finding of the trial court that plaintiff's method of repair, which is the customary practice in the industry except where encasement is absolutely unavoidable, and unobstructed access to the lines for that purpose are reasonably necessary and not just a matter of convenience, because of the substantially additional burden in time and money involved if defendants' position were compelled. Conversely, the erection of a building over the lines is not reasonably necessary for the landowner's enjoyment of his reserved rights in the property in the light of the language of the grant and the nature and incidents of the easement.[6] We do not feel

---

[6] Our conclusion is reached without regard to alleged especially corrosive qualities of the soil on defendants' property, which was the subject of considerable testimony but likewise disregarded by the trial judge in arriving at his findings. It is also reached without regard to any fire or explosion hazard in event of a leak in a pipeline under a building, casually adverted to in the oral opinion below, but which defendants say was not an announced contention and so not fully tried out as far as their side was concerned.

that this conclusion is in any way weakened by defendants' contention that a carrier pipe which is encased may not require repairs or replacement as soon or as frequently as one not so contained, because it is protected from any deleterious effects of the surrounding earth. The evidence is that even a new encased pipe may and sometimes does split or a leak therein occur shortly after installation for other reasons. The matter of reasonable necessity should not turn on speculation of this nature.

In view of the tremendous pipeline mileage in this country today,[7] there are surprisingly few reported cases in other jurisdictions on the question of the right to build over them. This may indicate a general feeling that it may not be done in the absence of a sufficient reservation in a grant of the right to do so. What decisions there are go both ways, but frequently turn on the language of the grant, the particular factual circumstances or matters of pleading and procedure and so have limited value as broad precedent. They are collected in Annotation, "Correlative rights of dominant and servient owners in right of way for pipelines," 28 *A. L. R.* 2d 626 (1953), and subsequent *A. L. R.* 2d Supplement Service volumes. There one can find the cases which each side relies upon in its respective briefs here. No useful purpose will be served by individual discussion thereof. Our study convinces us that those which deny the right to build in analogous factual situations and involving similar grants represent the sounder view for the reasons which we have previously spelled out. See, *e. g., Central Kentucky Natural Gas Co. v. Huls,* 241 *S. W.* 2d 986, 28 *A. L. R.* 2d 621 (*Ky. Ct. App.* 1951).

---

[7] By 1952 there were 170,000 miles of petroleum pipelines in the United States. 17 *Encyclopedia Brittanica* 664 (1959). It is common knowledge that many more have been constructed since. Between February 1942 and the end of 1962, the Federal Power Commission had authorized more than 103,000 miles of gas pipelines. *Id.,* 1963 *Supp., p.* 367.

■ We are likewise in thorough accord with the trial court's determination on defendants' counterclaim that plaintiff did not violate the easement authorizing the transportation of "petroleum" by carrying No. 2 fuel oil through the pipes. There was much evidence that "petroleum" in its crude state technically is composed of the various products,—gasoline, kerosene, naptha, fuel oil, etc.—subsequently separated and distilled from it by a mechanical, not a chemical, process, as well as that the term is used in the industry as a generic term to include both such products and the crude substance. While it might well be said, as the trial judge intimated, that execution by the grantor of an instrument, prepared by one in the industry, containing a term so understood amounts to asquiescence in ascribing the generic meaning to it, cf. Leitner v. Braen, 51 N. J. Super. 31 (App. Div. 1958), it is unnecessary to ground our conclusion, as he did not, on this thesis.

■ It is a well settled principle of easement law in this State "* * * that the owner of an easement in the land of another is not bound to use it in the particular manner prescribed by the instrument which creates it. He may use it in a different manner if he so desires, provided he does not, in doing so, increase the servitude, nor change it to the injury of the owner of the servient tenement." Tallon v. Hoboken, 60 N. J. L. 212, 218 (E. & A. 1897). 2 Thompson, Real Property § 426, p. 694 (1961 repl.); 2 American Law of Property § 8.66, p. 278 (1952). So, as in Tallon, where the grant was to lay tracks for horse cars and steam cars, the holder thereof might run cars propelled by electric power. But cf. Sellick v. Jersey Central Power & Light Co., 124 N. J. L. 110 (E. & A. 1940). An easement for passage is not limited to vehicles in use at the time of the grant, but includes a new method of transportation such as the automobile, so long as no added burden is placed upon the landowner. Matteodo v. Capaldi, 48 R. I. 312, 138 A. 38, 53 A. L. R. 550 (Sup. Ct. 1927). And in our case, no one could sensibly contend that plaintiff might not use subsequently developed

welded steel pipe instead of the iron pipe called for by the grant.

The evidence here was clear beyond question that No. 2 fuel oil is less volatile, has a lower flash point and so is less hazardous in the event of a leak than crude petroleum. Obviously no conceivable increase in burden was cast upon defendants by its transmission and plaintiff is clearly entitled so to use the lines. We, like the trial court, need go no further in this case.

The judgment of the Chancery Division is affirmed. Final implementation thereof may be accomplished in that court, if necessary, pursuant to the provision in its judgment retaining jurisdiction for purposes of enforcement and any necessary further relief.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.