

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-6-2007

# Piscataway v. Duke Energy

Precedential or Non-Precedential: Precedential

Docket No. 05-4521

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Piscataway v. Duke Energy" (2007). *2007 Decisions*. Paper 851.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/851

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-4521

———

TOWNSHIP OF PISCATAWAY; ALLEN HOWARD;
PEGGY FRIEDMAN; ROBERT HESELTINE;
GAIL HESELTINE; EDWIN MARKANO;
WILLIAM MALLEK; GUY SUABEDISSEN;
TIMOTHY SIMMONDS; PATRICIA SIMMONDS;
JUDITH PAYNE; MICHAEL MATUCH;
DONNA MATUCH; THERESA FLEMING;
ANGELO BARISO; CHARLENE BARISO;
KYLLENE COX; NORMAN HERMAN; LIBBY HERMAN;
NAOMI SHAPIRO; JOEL SHAPIRO

v.

DUKE ENERGY; TEXAS EASTERN TRANSMISSION,
CORP.,   Appellants

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 01-4828)
District Judge: Honorable Faith S. Hochberg

———

Argued November 27, 2006

Before: FUENTES and GARTH, <u>Circuit Judges</u>, and POLLAK,[*]
District Judge

---

[*] The Honorable Louis H. Pollak, U.S. District Judge for
the Eastern District of Pennsylvania, sitting by designation.

(Filed: June 6, 2007)

Edwin C. Landis, Jr. (Argued)
William H. Schmidt, Jr.
Meyner & Landis, LLP
One Gateway Center, Suite 2500
Newark, NJ 07102

      Counsel for Appellants

Steven D. Cahn (Argued)
Cahn & Parra, LLC
1015 New Durham Road
Edison, NJ 08817

      Counsel for Appellees

_____

OPINION OF THE COURT

_____


FUENTES, Circuit Judge.

This action was initiated by the Township of Piscataway and a group of homeowners to prevent Duke Energy Operating Company, LLC ("Duke") and Texas Eastern Transmission, LP ("Texas Eastern") from removing fifty shade trees planted along a public street in Piscataway, New Jersey. The companies claimed that it was necessary to remove the trees for the safe inspection and maintenance of three high-pressure, natural gas pipelines located beneath the street. After the Township settled with Duke and Texas Eastern, the companies and the homeowners cross-moved for summary judgment. The District Court ruled in favor of the homeowners and permanently enjoined Duke and Texas Eastern from removing the trees. Because we conclude that there are genuine issues of material

2

fact as to (1) whether removal of the trees is reasonably necessary to the maintenance of the pipelines, and (2) whether Duke and Texas Eastern are barred by the doctrine of laches from asserting a right to remove the trees pursuant to an easement grant, we will vacate the District Court's judgment and remand for further proceedings.

## I.

In the early 1940s, Flora and H. Morgan Heath, predecessors-in-title to the homeowners in this lawsuit, took title to a large tract of undeveloped land located in the Township of Piscataway (the "Heath property").[1] In May 1944, the Heaths granted Defense Plant Corporation ("Defense Plant"), and its successors and assigns, "the right to lay, operate, renew, alter, inspect and maintain" two pipelines for the transportation of natural gas. App. at 72. The 1944 grant required Defense Plant:

> to bury such pipelines so that they will not interfere with the cultivation or drainage of the land, and also to pay any and all damages to stock, crops, fences, timber and land which may be suffered from the construction, operation, renewal, alteration, inspection or maintenance of such pipelines.

Id. Defense Plant subsequently constructed two twenty-inch diameter natural gas pipelines.

In the years that followed, Max and Mildred Richter and Ethel and Philip Gerber assumed title to the Heath property, and Texas Eastern Transmission Corporation ("TETCO") succeeded to Defense Plant's easement rights. In January 1960, the Richters and Gerbers granted TETCO the right to construct a

_____

[1] In the Final Pretrial Order entered by the District Court on November 25, 2003, the parties to this appeal stipulated that the Heaths, as the original grantors of the easement, are predecessors-in-title to the homeowners in this case.

third pipeline across the property. The 1960 grant imposed the following restrictions on the parties:

> The said Grantor is to fully use and enjoy the said premises, except for the purposes granted to [TETCO] and provided the said Grantor shall not construct nor permit to be constructed any house, structures or obstructions on or over, or that will interfere with the construction, maintenance or operation of, any pipe line or appurtenances constructed hereunder, and will not change the grade over such pipe line.

> [TETCO] agrees to bury all pipes to a sufficient depth so as not to interfere with cultivation of soil, and agrees to pay such damages which may arise to growing crops, timber, or fences from the construction, maintenance and operation of said lines.

App. at 74. TETCO then constructed a third, thirty-six-inch diameter pipeline.

Over the next several years, the Heath property passed through the hands of a number of different owners. In February 1963, three real estate development companies that then owned the property entered into an agreement with TETCO in which TETCO agreed to reduce the size of the easement by releasing all portions of the land in the 1944 and 1960 grants not needed for the pipelines. Attached to the 1963 agreement is a drawing prepared by TETCO, which shows a proposed residential neighborhood (referred to as "University Hill") through which TETCO's sixty-foot wide easement runs at a slight diagonal. The 1963 agreement preserved all of the rights and restrictions set forth in the 1944 and 1960 grants.[2] Sometime thereafter, appellant Texas Eastern succeeded to TETCO's easement rights,

---

[2] All three instruments are hereinafter collectively referred to as "the easement grant."

4

and later became an affiliate of appellant Duke.[3]

As a result of residential development of the property, the land on which the easement is located became a one-block long public street named Fountain Avenue. The street is flanked by a large number of trees, many of which were planted in the early 1960s as part of the original residential development of the neighborhood and have grown to nearly seventy-five feet in height. The homeowner-appellees live in single-family homes built by the developers on lots adjacent to Fountain Avenue. Though all of the trees at issue in this appeal are located on Township property, the homeowners view the trees, from a practical and aesthetic perspective, as extensions of their front yards.

In April 2000, Duke announced that it would be removing approximately eighty trees from Fountain Avenue in order to better maintain the pipelines. Township residents vehemently opposed the proposed action. In October 2001, after several attempts to negotiate an agreement with Duke failed, the Township and the homeowners sued for injunctive relief in the Superior Court of New Jersey, Middlesex County, Chancery Division. The verified complaint asserted state law causes of action for trespass, breach of easement, and nuisance. The Superior Court immediately entered a preliminary injunction prohibiting Duke from removing the trees on Fountain Avenue.

Duke thereafter removed the matter to federal court based on diversity jurisdiction. In its answer, Duke denied the allegations set forth in the verified complaint, and counterclaimed for injunctive relief prohibiting the Township and the homeowners from interfering with their rights under the easement grant. In May 2002, the District Court denied Duke's motion for a preliminary injunction and noted that the state court

---

[3] Texas Eastern owns the easement and pipelines. Duke is responsible for inspecting and maintaining the pipelines. For the sake of convenience, we refer to appellants collectively as "Duke."

preliminary injunction prohibiting removal of the trees remained in effect.

In March 2003, the Township settled with Duke and consented to the immediate removal of fifty-five trees from Fountain Avenue, as well as to the future removal of any trees that exceed eight inches in diameter. The homeowners proceeded with the action and, following a hearing on April 26, 2005, the District Court denied the homeowners' request for a jury trial and dismissed the trespass claim. The District Court, however, held that the homeowners had standing to pursue the remaining breach of easement and nuisance claims. After discovery, the parties filed cross-motions for summary judgment on their respective breach of easement claims.

On September 20, 2005, the District Court granted the homeowners' motion for summary judgment and denied Duke's cross-motion for summary judgment on the parties' respective breach of easement claims. The Court concluded that Duke failed to proffer any evidence that removal of the trees was "reasonably necessary" to the maintenance of the pipelines. In addition, the District Court found that Duke was barred by the doctrine of laches from asserting a right to remove the trees pursuant to the terms of the easement grant. Accordingly, the District Court permanently enjoined Duke from removing any of the trees from Fountain Avenue.[4]

This timely appeal followed. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over standing issues, Gen. Instrument Corp. v. Nu-Tek Elecs. & Mfg., Inc., 197 F.3d 83, 86 (3d Cir. 1999), as well as a district court's summary judgment ruling, Mortellite v. Novartis Crop Prot., Inc., 460 F.3d 483, 488 n.3 (3d Cir. 2006).[5]

---

[4] The District Court noted in its opinion that circumstances might change so as to justify Duke's removal of the trees in the future.

[5] We note that after the Court heard oral argument in this matter, the parties consented to have the case referred to

## II.

After first addressing Duke's contention that the individual homeowners lack standing to bring this action, we turn to the District Court's rulings on the issues of reasonable necessity and laches.

### A.

The doctrine of standing encompasses both constitutional requirements and prudential considerations. <u>Miller v. Nissan Motor Acceptance Corp.</u>, 362 F.3d 209, 221 (3d Cir. 2004). The constitutional component derives from the Article III "case or controversy" requirement and has three elements:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

<u>Trump Hotels & Casino Resorts v. Mirage Resorts</u>, 140 F.3d 478, 484-85 (3d Cir. 1998) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)). "These requirements ensure that plaintiffs have a personal stake or interest in the outcome of the proceedings" sufficient to justify federal court intervention. <u>Joint Stock Soc'y v. UDV N. Am., Inc.</u>, 266 F.3d 164, 175 (3d Cir. 2001) (internal quotation marks omitted).

---

mediation. Mediation was not successful, and we now issue our opinion.

Prudential standing "constitute[s] a supplemental aspect of the basic standing analysis and address[es] concerns regarding the need for judicial restraint." Oxford Assoc. v. Waste Sys. Auth., 271 F.3d 140, 145 (3d Cir. 2001). Thus, "[w]e . . . use the prudential limits of standing to ensure that only those parties who can best pursue a particular claim will gain access to the courts." Id. Prudential standing rests on the following principles:

> (1) the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties; (2) even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances pervasively shared and most appropriately addressed in the representative branches; and (3) the plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

Trump Hotels & Casino Resorts, 140 F.3d at 485 (internal quotation marks and citations omitted).

Duke contends that the homeowners do not have standing to enforce the terms of the easement grant because the homeowners were neither parties to the grant, nor owners of the land that is subject to its terms. We are not persuaded by Duke's argument and conclude that the homeowners have standing to pursue this action.[6]

_____

[6] It is not entirely clear from Duke's brief whether they are arguing that the homeowners lack *standing* to bring this action, or that they do not have a *cause of action* under state law. See 13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, Federal Practice and Procedure §

8

The fifty trees that Duke wishes to remove are located in front of the homeowners' property. In affidavits submitted to the District Court, the homeowners stated that they purchased their homes in part because of the economic and aesthetic value of the trees. Expert reports and certifications submitted to the District Court attest that the trees add to the value of the homeowners' property, help reduce air pollution, improve air quality, and provide cooling shade which reduces energy costs in the summer months. As the District Court observed, given the age and size of the trees, they are effectively irreplaceable. Removing the trees would cause actual injury to the homeowners, and a judicial determination that Duke cannot lawfully engage in the proposed conduct would unquestionably prevent that injury. Accordingly, we agree with the District Court that the homeowners have standing to pursue this action.

We also note that the homeowners have a cause of action under New Jersey law. As New Jersey's highest court stated in Clarke v. Kurtz, 196 A. 727, 728 (N.J. 1938):

> [W]hen it appears by the true construction of the terms of a grant that it was the well-understood purpose of the parties to create or reserve a right . . . for the benefit of other land owned by the grantor . . . any grantee of the land to which such right is appurtenant acquires by his grant a right to have the servitude or easement . . . protected in equity . . . .

See also, Roehrs v. Lees, 429 A.2d 388, 391 (N.J. Super. Ct. App. Div. 1981) ("The judge properly ruled that plaintiff had the burden of demonstrating that the covenant was intended for his benefit and that defendants were aware of its existence and of its

---

3531 & n.7 (2d ed. 1984 & Supp. 2007) (noting that existing case law sometimes conflates the concepts of standing and cause of action). Because the homeowners plainly satisfy both requirements, we see no need to comment on the distinction between standing and stating a cause of action.

9

purpose to benefit plaintiff. Once that burden had been met plaintiff was entitled to enforce the covenant for his benefit . . . ."); Mango v. Brodsko, 108 A.2d 879, 880 (N.J. Super Ct. Ch. Div. 1954) ("Generally, a restrictive covenant imposed upon land by a grantor in a conveyance of a portion of a tract of land, if such restrictions are for the benefit of the balance of the land retained by the grantor, may be enforced by him or a subsequent grantee of the whole or a part of said retained land.").

In this case, the restrictions set forth in the easement grant were clearly intended by the original grantor, the homeowners' predecessors-in-title, to benefit the land by ensuring that the pipelines would not unduly interfere with the cultivation and development of the property. The homeowners took title to their homes with notice of the easement grant, and the rights and restrictions set forth in the grant. It is reasonable to infer from the drawing attached to the 1963 agreement that when TETCO, Duke's predecessor-in-title, executed the agreement, it was aware that the owners of the property—three real estate development companies—planned to build a residential neighborhood through which the pipelines would run. Based on these facts, the individual homeowners have a cause of action under New Jersey law.[7]

## B.

We now turn to (1) whether removal of the trees on Fountain Avenue is "reasonably necessary" to Duke's maintenance of the pipelines, and (2) whether Duke is barred by the doctrine of laches from asserting a right to remove the trees pursuant to the terms of the easement grant.

---

[7] As the homeowners have a cause of action under New Jersey law, they plainly satisfy the requirements of prudential standing. See Trump Hotels & Casino Resorts, 140 F.3d at 485 (noting that in order to satisfy the requirements of prudential standing, a litigant must "assert his own legal rights and interests").

## 1.

Duke operates the pipelines and maintains the easement pursuant to certificates of public convenience and necessity issued by the Federal Energy Regulatory Commission ("FERC"). The Company is subject to regulation by FERC under the Natural Gas Act, 15 U.S.C. § 717, and by the Department of Transportation ("DOT") under the Natural Gas Pipeline Safety Act, 49 U.S.C. § 60101. Applicable regulations require Duke to inspect the pipelines on a regular basis, but do not prescribe a particular method of inspection. See 49 C.F.R. § 192.705 (2006).

Duke has promulgated a set of Standard Operating Procedures ("SOPs") that meet and, in some cases, exceed federal requirements. Pursuant to its SOPs, Duke typically conducts aerial surveillance of the easement three times per week in order to identify any encroachments on or near the pipeline right-of-way, as well as any distressed vegetation that might indicate a gas leak. Duke also routinely patrols the pipeline right-of-way by car.

Every few years, Duke inspects the pipelines using a device referred to in the industry as a "smart pig," which is placed inside the pipelines to measure the thickness of the pipeline walls. Because of the difficulty and expense associated with its use, the smart pig is not deployed on a routine basis. As of May 2006, the date the parties briefed this appeal, the smart pig had last been used to inspect the Fountain Avenue portion of the pipelines in 2003 and 2004, at which time no irregularities or weaknesses in the walls were detected.

In addition, the state of New Jersey has implemented a "One-Call System," which requires contractors to notify the state several days prior to the start of any excavation project. Duke and other pipeline operators are required by the One-Call System to respond to any such notification and to work with the contractors to ensure that the pipelines are not damaged or disturbed in the course of excavation. See N.J. Stat. Ann. §§ 48:2-73 to -91 (1998 & Supp. 2007).

11

The easement grant explicitly confers upon Duke the right to inspect and maintain the pipelines, but does not specify whether that right includes the authority to remove trees or foliage from the pipeline right-of-way. Even in the absence of an express right, however, "there is, arising out of every easement, an implied right to do what is reasonably necessary for its complete enjoyment, that right to be exercised, however, in such reasonable manner as to avoid unnecessary increases in the burden upon the landowner." Tide-Water Pipe Co. v. Blair Holding Co., 202 A.2d 405, 412 (N.J. 1964). As the New Jersey Supreme Court has explained, "the touchstone is necessity and not convenience." Hammett v. Rosensohn, 140 A.2d 377, 383 (N.J. 1958).

Duke asserts that removal of the trees is reasonably necessary for inspection and maintenance of the pipelines. More specifically, Duke contends that (1) the trees prevent it from conducting aerial surveillance of the pipeline right-of-way; (2) the trees impede emergency access to the pipelines in the event of an unexpected and potentially devastating pipeline emergency; and (3) root growth from the trees is damaging the protective coating of the pipelines thereby increasing the possibility of a dangerous gas leak or explosion.

a) *Aerial Surveillance*

The District Court found that Duke "proffer[ed] no evidence that airplanes could not see construction equipment through the trees' branches, and they proffer[ed] no facts to demonstrate that land surveillance, in combination with the warning signs against construction on Fountain Avenue (required by law) and the Township's ability to regulate construction on its property, is ineffective to give them notice regarding safety and maintenance of the pipelines." App. at 25. We disagree, and conclude that Duke introduced sufficient evidence to raise a triable issue as to whether aerial surveillance is reasonably necessary to the maintenance of the pipelines and, if so, whether the Fountain Avenue trees prevent such surveillance.

12

For example, Duke presented an expert report prepared by Terry Mock, a right-of-way consultant with experience in the utilities industry. Mock stated in his report:

> While the [DOT] Regulations allow that the Right-of-Way can be inspected by Walking, Driving or Flying, Pipeline Companies utilize airplanes to comply with the inspection of there [sic] Right-of-Way because they are the least obtrusive, and most efficient means to perform this task.
>
> Patrol Planes are looking for distressed vegetation that might indicate a leak or release of product . . . .
>
> Patrol Planes are looking for encroachment activities that affect the safe operation of the pipeline. The pilots are inspecting conditions on and adjacent to the Right-of-Way. Construction activity that is taking place on the Right-of-Way without a one-call notice is too late . . . when a pilot observes activity approaching the Right-of-Way, that activity can be reported and investigated before the threat reaches the Right-of-Way.

App. at 360-62.

According to the certified statement of Don Thompson, a Right-of-Way Supervisor for Duke Energy:

> The most effective way to patrol the pipeline on a regular basis (i.e. three (3) times a week, weather permitting) is by air. Inspection by "drive by" alone is not as effective because of parked vehicles, blockage of lateral view by vegetation and the difficulty in observing dying grass or other vegetation (indicating gas leaks) from a horizontal view. "Drive by" inspections are also cost prohibitive.

13

App. at 486.

Duke also submitted to the District Court "Special Report 281," prepared in 2004 by the Transportation Research Board of the National Academies,[8] which states:

> Companies are required by federal regulation to inspect their rights-of-way on a regular basis; they often do so by using aircraft, especially for properties lacking public access. Without regular clearing of the rights-of-way, such inspection can be ineffective.

App. at 532.

In addition, the Pre-Trial Order entered by the District Court indicated that Duke intended to present Steven Warner, a Duke pilot, as a trial witness who would "testify pertaining to tree cover making him unable to observe the Easement from the air." App. at 656.

This evidence, of course, does not necessarily establish that aerial surveillance is necessary to the safe maintenance of the pipelines, as opposed to being more convenient or cost-effective than land surveillance. On a motion for summary judgment, however, Duke must only proffer evidence sufficient to raise a genuine issue for trial. We think Duke has done so, and that the evidence Duke has presented justifies a full hearing on the merits of their argument.

b) *Emergency Access*

---

[8] The Transportation Research Board of the National Academies is a division of the National Academy of Sciences, a private, nonprofit society of scholars engaged in scientific and engineering research. According to Special Report 281, "[o]n the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters." App. at 498.

The District Court likewise rejected Duke's contention that the Fountain Avenue trees prevent them from gaining quick access to the pipelines in the event of an emergency. The sole explanation offered by the District Court was that "[n]o evidence has been proffered regarding what trees are currently in the way or that any such tree could not be quickly removed in the event of an emergency." App. at 26.

Duke points out that in settling with the Township, it agreed to remove only the fifty-five trees that posed the greatest danger to the pipelines. According to the certified statement of Tim Vaughan, Duke's Area Superintendent in New Jersey, it is these trees "that can result in an inspection missing dangerous earthmoving or other construction activities in the Right of Way Grant. In the event of an emergency, these same trees can cause life threatening delays when we must gain quick access to the Pipelines." App. at 161. As with Duke's evidence concerning its inability to effectively inspect the pipeline right-of-way by air, we conclude that the evidence in the record concerning emergency access to the pipelines raises a factual issue that is properly resolved at trial.

c) *Root Growth*

With respect to alleged dangers posed by root growth, the District Court stated:

> [Duke] proffered no evidence during discovery that any of the tree roots that have been on Fountain Avenue for forty years are rubbing against the pipelines; have proffered no evidence as to how long after excavation the "atypical" root growth will continue; and no proffer of any test on the roots of the five trees that have recently been cut down on Fountain Avenue (with the consent of some residents) to determine if they had reached or were in fact rubbing against the pipeline.

App. at 26. Although the District Court raises significant concerns, there is also substantial evidence in the record

15

suggesting that the tree roots nevertheless pose a significant threat to the integrity of the pipelines. For example, Duke's expert, Terry Mock, stated in his report:

> [R]oots do atypical things in a pipeline environment. The friction of the gas/product moving through the pipeline causes the soil temperatures to be warmer along the pipeline. . . . Pipelines are constructed by excavating a ditch/trench into the soil, many times into undisturbed soil. Making those undisturbed areas now disturbed. . . . The soils have be[en] oxygenated by the disturbance, and the nutrients in the topsoil were mixed throughout the ditch/trench . . . thus providing for an environment that promotes tree development. . . . You'll find root development at deeper depths than typical. . . . Not only does a pipeline environment allow tree roots to do atypical things, I believe those factors attract tree roots to develop around and along the pipeline. . . . As the tree root becomes in contact with the pipeline it damages the protective coatings. . . . Over time the coating will be damaged to [the] point that [it] will be rendered useless.

App. at 379-83; 390; 392-93.

> Mock further stated:

> In my professional opinion, both from my horticulture background and my experience in the Right-of-Way profession in the pipeline industry, I strongly believe that the trees along Fountain Avenue interfere with the Operation and Maintenance of the pipeline. The trees have the ability to cause the pipeline company to be out of compliance with the Federal Regulations which they operate under.

16

App. at 434-35.

Moreover, we think the District Court overlooked evidence that would explain Duke's decision not to conduct root tests on either the existing Fountain Avenue trees or the five trees that were removed from Fountain Avenue in December 2004 with the consent of the parties.[9] According to the certified statement of Vaughan, Duke's Area Superintendent, for example:

> 15. On every occasion of actual exposure of the pipes and my inspection of them, the critical protective coating has been discovered to be very brittle and fragile.
>
> 16. If roots are in contact with this brittle and fragile coating, it is almost a certainty that any disturbance of the roots proximate to the pipe will result in a breach of the coating.
>
> 17. It is for this reason that the decision was made, with my full agreement, not to excavate the root system of any of the trees recently removed on Fountain Avenue.
>
> . . . .
>
> 19. Because I anticipated root contact with the pipes [on Fountain Avenue], I realized that digging into a root system would probably result in a

---

[9] On December 17, 2004, Duke filed an unopposed motion with the District Court to partially vacate the state court's preliminary injunction so as to permit them to remove five trees pursuant to the terms of the settlement agreement with the Township. The District Court granted Duke's request on January 27, 2005. Duke removed the trees by cutting them down and grinding the remaining stumps to ground-level, but left the roots of the trees intact.

17

breach of the coating system which would necessitate replacement of the coating system.

. . . .

22. The correct way to deal with the Fountain Avenue situation is to stop the roots from growing by cutting down the trees. That will prevent future growth of the roots that could damage the coatings.

App. at 478-79. In view of this evidence, we conclude that a full hearing on the dangers posed by root growth is appropriate.

In sum, we conclude that because there is a triable issue of fact as to whether removal of the trees is reasonably necessary to Duke's maintenance of the pipelines, the District Court should not have entered summary judgment in favor of the homeowners.

**2.**

The District Court also ruled that Duke was barred by the doctrine of laches from asserting a right to remove the trees pursuant to the terms of the easement grant. Specifically, the District Court found that Duke's "forty-year delay" in asserting a right to remove the trees was inexcusable and prejudicial to the homeowners, who purchased their homes believing that the trees would remain on Fountain Avenue and thereby contribute to their use and enjoyment of their property.

Under New Jersey law, laches is "an equitable defense that may be interposed in the absence of the statute of limitations." Lavin v. Bd. of Ed., 447 A.2d 516, 519 (N.J. 1982). "Laches may only be enforced when the delaying party had sufficient opportunity to assert the right in the proper forum and the prejudiced party acted in good faith believing that the right had been abandoned." Knorr v. Smeal, 836 A.2d 794, 800 (N.J. 2003). "The key factors to be considered in deciding whether to apply the doctrine are the length of the delay, the

18

reasons for the delay, and the 'changing conditions of either or both parties during the delay.'" Id. (quoting Lavin, 447 A.2d at 520). These are factual determinations that typically should be made after a full evidentiary hearing. See, e.g., 27A Am. Jur. 2d Equity § 201 (1996) ("Where a defendant asserts the laches defense, a full hearing of testimony on both sides of the issue is required.").

In its decision, the District Court rejected, out of hand, Duke's proffered explanation for not seeking to remove the trees prior to April 2000. In the District Court's words, "[Duke's] explanation for this delay is that they have increased the stringency of their SOPs beyond that legally required by safety standards, an event completely within [Duke's] control. Stringent procedures are laudable, but [Duke] can produce equal results with ground surveillance as with aerial surveillance." App. at 30. There is, however, significant evidence in the record that would explain Duke's failure to remove the trees prior to April 2000.

For example, Thompson, Duke's Right of Way Manager, offered the following explanations in his certified statement:

> 4. Due to advances in safety technology and lessons learned from accident experiences nationwide over time, safety standards for the pipeline industry have continually evolved over the years I have worked in the industry.
>
> 5. While Duke has always been diligent in terms of pipeline safety and has maintained internal safety procedures (SOPs) and Guidelines that exceed the minimum required by the U.S. Department of Transportation, Office of Pipeline Safety, Duke became even more diligent in its safety standards following (a) the explosion that occurred in its right-of-way located in Edison, New Jersey on March 23, 1994 and (b) integrity management program regulations (the "Integrity Management Regulations") promulgated by the

19

DOT which became effective in February 2004. The Edison accident was caused by third party damage to the pipe there.

6. [Duke's Guideline TG-010] states that "[p]lanting of trees is not permitted on the pipeline right-of-way," [and] "[p]lanting of shrubs, bushes or other plants associated with landscaping on the pipeline right-of-way is subject to Company approval and shall not exceed 4 feet in height."

7. These requirements are fully consistent with industry standards and are substantiated by recent research on the subject.

. . . .

12. Duke, Texas Eastern and other affiliates of Duke operate approximately 18,000 miles of high pressure natural gas pipelines. In 1992, Texas Eastern started a program to improve pipeline safety by more thoroughly clearing right of way.

App. 484-86.

Duke introduced other evidence to explain why it did not seek to remove the trees before 2000. For example, Special Report 281 discusses recent pipeline failures and accidents, as well as the industry's response to these incidents:

Excavation and construction-related damage to pipelines remain the leading causes of pipeline failure. Such failures in 2003 were estimated by USDOT to contribute 22 percent of hazardous liquids and 24 percent of natural gas transmission pipeline incidents.

. . . .

Recently [the Office of Pipeline Safety]

implemented the Integrity Management Program, a regulatory approach that requires pipeline operators to comprehensively assess, identify, and address the safety of pipeline segments that are located in areas where the consequences of a pipeline failure could be significant.

. . . .

On March 23, 1994, a 36-inch-diameter pipeline owned and operated by Texas Eastern Transmission Corporation ruptured catastrophically in Edison Township, New Jersey . . . The force of the rupture and of natural gas escaping at a pressure of about 970 pounds per square inch gauge excavated the soil around the pipe and blew gas hundreds of feet into the air, propelling pipe fragments, rocks, and debris more than 800 feet. Within 1 to 2 minutes of the rupture, the gas ignited, sending flames upward 400 to 500 feet. Heat radiating from the massive fire ignited several building roofs in a nearby apartment complex. Occupants, alerted to the emergency by noises from escaping gas and rocks hitting the roofs, fled from the burning buildings. The fire destroyed eight buildings. Approximately 1,500 apartment residents were evacuated. Although none of the residents suffered a fatal injury, response personnel evacuated 23 people to a local hospital and another 70 apartment residents made their own way to hospitals.

. . . .

The final rule for integrity management of natural gas transmission pipelines in high-consequence areas went into effect in February 2004. This rule requires operators of natural gas transmission pipelines to develop integrity management programs for pipelines located where

21

a leak or rupture could do the most harm (i.e., could affect high-consequence areas). The rule requires gas transmission pipeline operators to perform ongoing assessment of pipeline integrity; to improve data collection, integration, and analysis; to repair and remediate the pipeline as necessary; and to implement preventive and mitigative actions.

App. at 512; 513; 524; 609. In light of these newly promulgated standards, as well as the greater attention paid to pipeline safety as a result of recent catastrophes, we believe the evidence is sufficiently compelling to create a genuine issue for trial on the homeowners' laches defense to Duke's breach of easement claim.

### III.

We recognize that a bench trial on the merits could result in precisely the same outcome should the District Court, after a full evidentiary hearing, conclude that removal of the trees is not reasonably necessary to the safe maintenance of the pipelines, or that Duke's decision not to seek removal of the trees prior to April 2000 bars it from doing so now.[10] Nevertheless, we conclude that such a determination should only be made after the parties have the opportunity to fully develop the factual record at

---

[10] We note that the parties also moved for summary judgment on the issue of whether the provision of the easement grant that prohibited Duke and Texas Eastern from interfering with the "cultivation" of the land applied to the removal of trees. In addition, at the invitation of the District Court, Duke filed a Fed. R. Civ. P. 12(b)(6) motion challenging the homeowners' nuisance claim. Because the District Court ruled in favor of the homeowners on the breach of easement claim, it concluded that it did not need to reach the "cultivation" issue or Duke's Rule 12(b)(6) motion. On remand, the District Court may find that it is necessary to rule on these issues before proceeding to trial.

22

trial.[11]

For the foregoing reasons, we will vacate the judgment of the District Court and remand for further proceedings consistent with this opinion.

_____

[11] For the same reasons, we reject Duke's argument that the District Court should have entered summary judgment in its favor on the breach of easement claim.