# ST. THOMAS-ST. JOHN BOARD OF ELECTIONS, Appellant/Cross-Appellee/Defendant
## v.
# HARRY DANIEL, Appellee/Cross-Appellant/Plaintiff

S. Ct. No. 2007-96

Supreme Court of the Virgin Islands

September 17, 2007

TERRYLN M. SMOCK, ESQ., TAMIKA ARCHER, ESQ., and AQUANNETTE CHINNERY-MONTELL, ESQ., Assistant Attorneys General, St. Thomas, USVI, *Attorneys for Appellant.*

CLIVE RIVERS, ESQ., Law Offices of Clive Rivers, St. Thomas, USVI, *Attorney for Appellee.*

CABRET, *Associate Justice*

## OPINION OF THE COURT

(September 17, 2007)

This appeal concerns the failure of the St. Thomas-St. John Board of Elections (the "Board") to certify Harry Daniel ("Daniel") as one of thirty elected delegates to the Virgin Islands Fifth Constitutional Convention (the "Convention"). Daniel, a resident of St. John and a candidate for delegate from the St. Thomas-St. John district, filed an action in the Superior Court of the Virgin Islands against the Board[1] seeking injunctive, declaratory and alternative mandamus relief requiring the

---

[1] The Virgin Islands Joint Boards of Elections and John Abramson, as Supervisor of Elections, were also named as defendants in the underlying action.

Board to certify him as a winner of the special election for delegates to the convention. After a trial in the matter, the Superior Court granted Daniel mandamus relief and ordered the Board to certify him as a delegate. The Board appealed, asserting that the trial court erred by failing to completely bar Daniel's claim based on laches, and by granting mandamus relief. In a cross-appeal, Daniel argues that the trial court correctly recognized his challenge to the Board's refusal to certify him as a delegate, but erred in barring his post-election contest to the form of the ballot. For the reasons which follow, we reverse the decision of the Superior Court and remand with instructions to dismiss Daniel's complaint.

## I. FACTS AND PROCEDURAL HISTORY

On September 29, 2004, the Virgin Islands Legislature passed Act No. 6688 (2004 V.I. Sess. Laws 191) ("Act 6688") to establish the Fifth Constitutional Convention. Act 6688 was signed into law on October 29, 2004. According to Act 6688, the Convention is to be comprised of thirty delegates. Of these thirty delegates, Act 6688 requires that "[t]hirteen delegates shall be elected from the district of St. Thomas-St. John, who shall be residents of either St. Thomas or St. John, provided that *not fewer* than two delegates shall be residents of St. John."[2] Act of Oct. 18, 2004, Bill No. 25-0016, 2004 V.I. Sess. Laws 191, § 1(d)(2) (emphasis supplied). Section (1)(h)(1) of Act 6688 provides that "[e]xcept as otherwise provided in this Act, the special election shall be governed by the election laws of the Virgin Islands, as provided under title 18 [sic] Virgin Islands Code." V.I. CODE ANN. tit. 18, § 47 authorizes the Boards of Elections, within their respective election districts, to regulate elections and to certify the results of elections.

The special election for delegates was scheduled for June 12, 2007. In preparation for the election, a ballot was created and available for viewing at the offices of the Board of Elections in both districts.[3] The ballot listed all candidates from the St. Thomas-St. John district on a single slate and

---

[2] The remaining seventeen delegates are to be comprised of thirteen delegates from St. Croix and four at large delegates to be selected equally from each district. Act of Oct. 18, 2004, Bill No. 25-0016, 2004 V.I. Sess. Laws 6688, § 1(d)(1) and (3). There is no controversy concerning the election and certification of these seventeen delegates.

[3] There is no evidence in the record showing who prescribed the form of this ballot.

instructed voters to select no more than thirteen candidates from the St. Thomas-St. John District, provided that not fewer than two delegates were residents of St. John. The ballot language concerned several members of the Board, and on June 2, 2007, seven members of the Joint Board of Elections convened an emergency meeting at which they unanimously voted to revise the St. Thomas-St. John district section of the ballot.[4] Upon being informed of the Board's decision, the Supervisor of Elections approved the revision. The revised ballot separated the St. Thomas and St. John candidates into two slates and instructed voters to select eleven candidates from the St. Thomas slate and two candidates from the St. John slate. The electronic voting machines were likewise reprogrammed to limit the voters' selection to eleven candidates from St. Thomas and two candidates from St. John. Daniel was listed on the slate of St. John candidates.

The changes to the ballot received immediate coverage in the news media. On June 2, 2007, the same day the Board decided to revise the ballot, a local radio station broadcast a report on the ballot revisions. On June 4, 2007, *The Virgin Islands Daily News* (the "Daily News") published a front page headline stating: "Virgin Islands Constitution ballot changes." (Tr. at 245.) An article about the ballot changes was printed on page two of the paper, and, upon questioning by the Court, Daniel acknowledged that he saw the headline on the front page, but claimed he did not read the article discussing the ballot changes. On June 5, 2007, the Daily News published another article about the ballot revisions. This article was headlined: "Elections officials approve revised ballots." (Supplemental App. at 73.) The article informed readers that "[a]nother portion of the ballot was changed in the St. Thomas-St. John district. Because two district candidates must come from St. John, candidates from that island have been separated on the ballot and instructions direct voters to select 11 candidates from St. Thomas and two from St. John for the district seats." (Supplemental App. at 73.) The article stated that voting machines would be reprogrammed to reflect the change and to prevent votes that would lead to spoiled ballots. Daniel admitted to the Court that he read the June 5, 2007 article and that it advised him that the ballot had been revised.

---

[4] We note that pursuant to section 1(g) of Act 6688: "[t]he form of the special election ballot shall be prescribed by the Supervisor of Elections . . . ."

A third article about the revised ballot appeared in the June 6, 2007 issue of the Daily News. This article was headlined: "Revamped constitutional convention ballots sent to absentee voters." (Supplemental App. at 75.) Daniel acknowledged that he read the headline, but denied reading the article. Upon questioning by the Court as to why he did not read the article, Daniel explained: "I didn't expect the election to turn out the way it did. I saw it. I figured the revised ballots were sent out to the absentee voters and I just waited until the election to see what they would think." (Tr. at 250.) On June 7, 2007, the Daily News published a sample ballot depicting the two slates of candidates with the instructions described above. Daniel acknowledged reading the sample ballot.

There were no challenges to the revised ballot in the week leading up to the election. The Supervisor of Elections testified that during the week prior to an election, including the weekend, he and his staff are available to address any election matters that arise. The Supervisor of Elections further testified that, if he had received a complaint about the ballot, he would have forwarded it to the Board, which could have revised the ballot.[5]

The special election for convention delegates was conducted as scheduled on June 12, 2007. Daniel received the third highest vote total of the St. John candidates and eighth highest vote total in the St. Thomas-St. John district. On June 15, 2007, three days following the special election, Daniel submitted a formal complaint to the St. Thomas-St. John Board of Elections challenging the ballot that was used.[6] On June 23, 2007, the Board certified the election results and did not include Daniel as a successful candidate. After a hearing on Daniel's complaint, the Board denied his request to be seated as a delegate to the Convention. Daniel subsequently appealed to the Joint Board of Elections, which on July 19, 2007, also denied him relief upon ruling that the appeal was improperly before them. Daniel filed his Superior Court action the same afternoon seeking relief to declare him among the winners of the special

---

[5] The Supervisor of Elections was mistaken in believing that action by the Board was necessary. Pursuant to section 1(g) of Act 6688, the Supervisor of Elections was responsible for prescribing the form of the ballot.

[6] Daniel lodged a verbal complaint with the Supervisor of Elections in person the previous day.

election.[7] In his Complaint, Daniel alleged that the defendants violated the mandate of Act 6688 by allowing *only two* delegates to be elected from St. John when the Act provided that "*not fewer than two* delegates shall be residents of St. John." (J.A. at 41.) (emphasis supplied).

The Superior Court, finding that Daniel would suffer irreparable harm in the absence of temporary injunctive relief, issued a temporary restraining order on July 20, 2007, preserving the status quo by delaying the date for the investiture of the delegates until a hearing could be held. After trial on the matter, the Superior Court determined that Daniel's action was partially barred by the doctrine of laches. The court found that Daniel had constructive notice of the revision as early as June 2, 2007, and actual knowledge of the revisions on June 4, 2007. The court further found that Daniel had adequate time to challenge the ballot and "did not exercise reasonable diligence by waiting to see whether he finished among the top two St. John candidates in the election results before asserting a challenge to the format of the revised ballot." (J.A. at 10.)

The trial court also found that the Board was prejudiced by Daniel's failure to exercise due diligence in asserting his challenge to the revised ballot. As noted by the trial court, "if Daniel succeeds in his belated challenge, a new special election would have to be held at great cost to the Territory." (J.A. at 11.) In this regard, the Supervisor of Elections testified at trial that more than $100,000 was spent to conduct the special election in the St. Thomas-St. John district. In addition to the costs of facilitating another special election, the trial court took judicial notice that the Virgin Islands Code treats election days as legal holidays. Therefore, the trial court found that holding a second special election would require the government to close for another election day.[8] Based on the findings that Daniel did not exercise due diligence in challenging the ballot and that his

---

[7] Daniel originally filed an appeal with the Joint Board on July 11, 2007, however, the Joint Board was unable to obtain a quorum to act on the appeal. Daniel initially filed suit in the Superior Court on July 17, 2007 requesting a temporary restraining order, preliminary injunction, and other relief. The Superior Court dismissed that action for failure to exhaust administrative remedies because the Joint Board had not yet acted on Daniel's appeal.

[8] Under Virgin Islands law, "[t]he day on which general elections are held shall be a legal holiday in the Virgin Islands." V.I. CODE ANN. tit. 18, § 3(a). A "general election" is defined as "the election which the law requires to be held in even-numbered years." 18 V.I.C. § 1. Whether a special election qualifies as a legal holiday under title 18, section 3(a) of the Virgin Islands Code is a question that is not before the Court, and we render no opinion on that issue.

lack of diligence prejudiced the Board, the court concluded that laches barred him from asserting a post-election challenge to the ballot.

The trial court reviewed as a separate question the issue of whether laches also barred Daniel from challenging the Board's refusal to certify him as a delegate to the Convention. In this regard, the court found that following the election, Daniel diligently contested the Board's failure to recognize him as an elected delegate. The court ruled that Daniel had a clear right to be seated as a delegate because he placed eighth in the St. Thomas-St. John district and, unlike the ballot, Act 6688 did not place any upper limit on the number of delegates who could be elected from St. John. The court thus found that the Board was required to certify Daniel as a delegate and, because he had no other adequate remedy, issued mandamus relief to compel this result.

The Board filed the instant appeal asserting that, although the trial court correctly ruled that laches barred Daniel's post-election ballot challenge, it erred in not ruling that laches also barred his challenge to the Board's failure to certify him as a delegate. In his cross-appeal, Daniel conversely argues that the trial court correctly recognized his claim that the Board was required to certify him as a candidate, but the court erred in ruling that laches barred his post-election challenge to the form of the ballot.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which vests the Supreme Court with jurisdiction over "all appeals arising from final judgments, final decrees, [and] final orders of the Superior Court." The standard of review for this Court in examining the Superior Court's application of law is plenary. *See Wexler v. Westfield Bd. of Educ.*, 784 F.2d 176, 181 (3d Cir. 1986). Findings of fact are reviewed on appeal under a clearly erroneous standard of review. *Id.* "[T]he appellate court must accept the factual determination of the fact finder unless that determination 'either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.'" *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91-92 (3d Cir. 1992) (citations omitted).

■ As a general rule, "the existence of laches is a question primarily addressed to the discretion of the trial court, . . . [but] that discretion is

free to operate only within narrowly defined parameters." *Churma v. U.S. Steel Corp.*, 514 F.2d 589, 592-93 (3d Cir. 1975) (internal quotations and citation omitted). The elements of laches, inexcusable delay and prejudice, comprise not only discretionary components but also questions of law and fact, which are to be reviewed as such. *Id.* at 593. Thus, we review the elements of laches under the following standards:

> Both the length of delay and the existence of prejudice are questions of fact to be reviewed by this court according to the "clearly erroneous" standard. On the other hand, the conclusion that a delay is "inexcusable" comprehends both the application of a legal standard and an exercise of the trial court's sound discretion in assessing the equitable circumstances of a particular case. Whether the [trial] court has utilized the correct legal principles is freely reviewable by this court, but we will not disturb the trial judge's assessment of the equities absent an abuse of discretion.

*Id.* (internal citations omitted).

## III. DISCUSSION

 Laches is an affirmative defense[9] under Rule 8(c) of the Federal Rules of Civil Procedure that bars a plaintiff's claim where there has been an inexcusable delay in prosecuting the claim in light of the equities of the case and prejudice to the defendant from the delay. *See Cook v. Wikler*, 320 F.3d 431, 438 (3d Cir. 2003); *Churma*, 514 F.2d at 593. "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282, 81 S. Ct. 534, 543, 5 L. Ed. 2d 551 (1961). "In the context of elections, this means that any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (citation omitted).

---

[9] The affirmative defenses under FED. R. CIV. P. 8(c) derive from the "common law plea by way of 'confession and avoidance,' which permitted a defendant who was willing to admit that the plaintiff's declaration demonstrated a prima facie case to then go on and allege additional new material that would defeat the plaintiff's otherwise valid cause of action." 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1270 (3d ed. 2004). Rule 32(b) of the Superior Court provides that "[a]nswers shall comply with Rules 8 and 9 of the Federal Rules of Civil Procedure." SUPER. CT. R. 32(b).

Where a complainant fails to exercise the requisite expedience in raising a pre-election claim,

> the courts have been wary lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs. As the Fourth Circuit put it, the "failure to require pre-election adjudication would permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action."

*Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988) (citing *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973))).

We are aware of only one other Virgin Islands decision that has addressed the laches issue in the context of an election challenge. In *Golden v. Government of the V.I.*, Civ. No. 2005/0005, Slip op. (D.V.I. Mar. 1, 2005), the District Court of the Virgin Islands ruled that laches barred an election contest under circumstances similar to ours. In *Golden*, one of the plaintiffs, Carmen Golden, sought re-election to the St. Croix Board of Elections as a Democrat. Only one seat was certified for the Democratic primary, and Golden was not elected to that seat upon receiving the second highest number of votes. In the general election four seats were open, and Golden received the fourth highest number of votes as a write-in candidate. Golden was ultimately denied a seat on the board, however, because the Democratic seats were full, and Golden was enrolled in the election as a Democrat. Golden and her husband subsequently challenged that decision, arguing that two Democratic seats should have been certified for the Democratic primary. The court concluded that the plaintiffs' claim was barred by laches. Specifically, the court found that the plaintiffs

> were well aware that only one seat had been certified for the Democratic primary, when they believed that two seats should have been certified. They lacked diligence by waiting to see whether their candidate of choice won the one certified seat, before bringing a legal action arguing that a second seat should have been certified. The doctrine of laches bars such post-election 'sandbagging on the part of wily plaintiffs.'

*Golden*, slip op. at 11 (quoting *Soules*, 849 F.2d at 1180).

The instant case is virtually indistinguishable from *Golden* in all material respects. Here, Daniel was well aware that according to the revised ballot only two seats were available for St. John candidates in the special election, when he believed that there should not have been any upper limit on the number of such seats. Daniel lacked diligence by waiting to see whether he would win one of those two seats. Similar circumstances justified the imposition of laches in *Golden*, and the evidence in the instant case supports the trial court's decision that laches barred Daniel from waging his post-election challenge to the composition of the ballot.

Specifically, there is ample evidence to support the trial court's findings concerning the length of the delay. The evidence shows that on June 4, 2007, Daniel had actual knowledge that the ballot had been revised.[10] Daniel acknowledged reading the newspaper headline reporting the ballot change. Furthermore, even if Daniel could claim that he did not learn about the specifics of the ballot revisions on June 4, 2007, he acknowledged reading a newspaper article on June 5, 2007, which provided a detailed account of the ballot revision. Daniel further conceded that he reviewed a sample ballot published in the newspaper on June 7, 2007. This Court must accept the factual determinations of the trial court unless the determinations are completely devoid of minimum evidentiary support displaying some hue of credibility, or bear no rational relationship to the supportive evidentiary data. *See Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91-92 (3d Cir. 1992). In light of the evidence of record, the trial court's determination that Daniel had ample pre-election notice of the revision is not clearly erroneous.

The record further supports the trial court's determination that Daniel's delay in lodging his complaint was inexcusable. Despite his knowledge of the ballot change, Daniel remained silent and gambled that he would be elected as a delegate. Daniel's testimony regarding his silence merits repetition: "I didn't expect the election to turn out the way it did. I saw it. I figured the revised ballots were sent out to the absentee voters and I just waited until the election to see what they would think." (Tr. at 250.)

---

[10] Although the trial court found that Daniel had constructive knowledge of the ballot revision on June 2, 2007, the date that a radio station broadcast a report on the revision, we do not believe this finding is necessary to reach a result and express no opinion whether such circumstances constitute constructive knowledge sufficient to support a claim of laches.

The case law is replete with opinions chiding such dilatory conduct. *See, e.g., Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d at 1180 ("courts have been wary lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs"); *Hendon v. N.C. State Bd. of Elections*, 710 F.2d at 182 (same); *Golden*, slip op. at 11 (same); *Toney v. White*, 488 F.2d at 314 ("the failure to require prompt pre-election action in such circumstances as a prerequisite to post-election relief may permit, if not encourage, parties who could raise a claim 'to lay by and gamble upon receiving a favorable decision of the electorate' and then, upon losing, seek to undo the ballot results in a court action"); *Jordan v. Cook*, 277 Ga. 155, 587 S.E.2d 52, 53 (2003) ("[w]e wholly reject the notion that the laws of this State allow a candidate to sit on his rights hoping for the best and, only after the voters have participated in the democratic process to elect their representative, file an appeal"); *Lewis v. Cayetano*, 72 Haw. 499, 823 P.2d 738, 741 (1992) ("efficient use of public resources demand that we not allow persons to gamble on the outcome of the election contest then challenge it when dissatisfied with the results"); *Flake v. Bd. of Elections of NYC*, 122 A.D.2d 94, 504 N.Y.S.2d 465 (1986) ("[a]lthough it appears that there was sufficient time for a court to rectify the omission, candidate Flake failed to seek any affirmative relief from the court which had ordered his name on the ballot. In a word, he slept on his rights and allowed the election to go forward with full knowledge that his name would not appear on the absentee and military ballots").

Indeed, the evidence shows that if Daniel had expeditiously raised his complaint, there was little, but still adequate time for the Board to address the deficiency before the June 12, 2007, special election. The Supervisor of Elections testified that within a week of an election his staff is available to handle any inquiries or challenges by the candidates. He also testified that had he been notified of a complaint, he would have forwarded the complaint to the Board which could have revised the ballot.[11] Moreover, the record demonstrates that the Supervisor of Elections was capable of changing the ballot within five days. This is evidenced by the fact that the Board's June 2, 2007 revision of the ballot was published in the newspaper on June 7, 2007, just five days after the revision was approved.

In light of these facts, we find that the trial court did not abuse its discretion in assessing the equitable circumstances attending Daniel's

---

[11] *See supra* notes 4 and 5.

delay. Simply put, Daniel knew about the ballot revision before the election, yet failed to lodge a pre-election complaint. Although there was sufficient time for the Board to address Daniel's claim, had he raised it, Daniel decided to wait until after the election to see if he would be elected notwithstanding the ballot instructions. Furthermore, we agree with the trial court's conclusion that the length of delay and the associated equitable circumstances, rendered Daniel's delay in challenging the ballot inexcusable.

In the instant case, the record also contains ample evidence to support the trial court's finding that the defendants were "clearly prejudiced by Daniel's lack of diligence in challenging the format of the revised ballot . . . ." (J.A. at 11.) The evidence shows that in the week preceding the special election, Daniel's ballot challenge was ripe for review, yet he did nothing to inform the Board or Supervisor of Elections that he perceived a problem with the ballot. During this time, the Board and Supervisor of Elections expended significant resources proceeding with election preparations and overseeing the election itself, unaware that Daniel had a grievance concerning the ballot. Indeed, the trial court found that the Joint Board of Elections "spent more than $100,000 to conduct the special election in the St. Thomas-St. John district . . ." (J.A. at 11.) The trial court further found that "within a week of an election [the Supervisor of Elections] and his staff is available during ample weekend hours and on Election Day to handle any inquiries or challenges by the candidates. Notwithstanding this, Daniel did not assert any pre-election challenge to the revised ballot."[12] (J.A. at 9-10.)

---

[12] The dissent asserts that the trial court erred in finding prejudice to the defendants as any attempt by Daniel to protest the ballot would have proved futile because the Board was unlikely to change its position. This is mere speculation as there is no evidence to support this position. The evidence shows that concerns about the ballot were raised by some Board members which were promptly addressed. Nothing in the record suggests that the Board would not have promptly addressed any objection to the ballot raised by a candidate. The actual facts are that Daniel made no challenge of any kind to the ballot although aware of the residency limitation placed on his candidacy, and the Board was prejudiced as it conducted the election unaware of any concerns about the ballot from Daniel or any other candidate. To accept the dissent's argument would permit any candidate to sit on his rights, lay and wait for the results of the election and claim a believed futility as the reason for not asserting a pre-election challenge. This result is unacceptable as it would turn the doctrine of laches on its head.

■ These facts clearly show that the Board and Supervisor of Elections were prejudiced by Daniel's silence. The Board relied on the absence of any challenge and the correctness of the ballot as it expended significant time and resources preparing for and overseeing the election. *See Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (prejudice caused where state expended significant resources preparing for election ignorant of candidate's ballot concern and court concluded "the failure of the appellant to press his case when he should have known that an injury had occurred is fatal to his receiving any relief"); *Ross v. St. Bd. of Elections*, 387 Md. 649, 876 A.2d 692, 706 (2005) ("[t]he State Board likewise was prejudiced because it too relied upon the correctness of the ballots and expended considerable efforts in overseeing the election when Branch's candidacy could have been protested judicially prior to the election on November 2nd"). Furthermore, although the Board and Supervisor of Elections had the time and resources available to deal with a ballot contest before the election, they had no opportunity to address Daniel's challenge because he remained silent. The prejudice caused by Daniel's failure to timely assert his challenge is even more disturbing considering evidence showing that if he had expeditiously raised his complaint, there was ample time for a revised ballot to be prepared for the special election.[13] Accordingly, the trial court's finding of prejudice was not clearly erroneous. Thus, in light of the prejudice caused by Daniel's inexcusable delay in challenging the ballot, we find no merit in his cross-appeal, and agree with the trial court's decision to bar his post-election challenge to the form of the ballot.

■ Before turning to the Board's assertion that the trial court erroneously failed to bar Daniel's Board certification claim, we must first address Daniel's claim that equity precludes the Board from raising the assertion. Specifically, Daniel argues that the equitable doctrine of unclean hands bars the Board from challenging the trial court's decision. Daniel failed, however, to raise this argument below. Appellate courts generally refuse to consider issues that are raised for the first time on appeal. *See Newark Morning Ledger, Co. v. United States*, 539 F.2d 929, 932 (3d Cir. 1976). "[A]bsent exceptional circumstances, an issue not raised in the [trial] court will not be heard on appeal." *Franki Found.*

---

[13] The decision to revise the ballot was made on June 2, 2007, and the revisions were completed in time for the ballot to be printed in the June 7, 2007, edition of the Daily News.

*Co. v. Alger-Rau & Assocs., Inc.*, 513 F.2d 581, 586 (3d Cir. 1975). Daniel has not presented this Court with any exceptional circumstances to warrant waiver of the general rule. Therefore, this Court will not consider the doctrine of unclean hands.

■ Furthermore, on appeal to this Court, the scope of our review is restricted to those questions that were properly preserved for review in the trial court and further raised on appeal according to the rules of this Court. *See* V.I. S. CT. R. 22(a)(3) (appellant's brief must contain a statement of the issues presented for review, which must "include a designation by reference to specific pages of the appendix or place in the proceedings at which each issue on appeal was raised, objected to, and ruled upon; and a statement of the standard or scope of review for each issue on appeal"); V.I. S. CT. R. 22(a)(5) (appellant's argument must "contain the contentions of appellant with respect to the issues presented, the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on"); *see also Frank v. Colt Indus., Inc.*, 910 F.2d 90, 100 (3d Cir. 1990) ("[p]articularly where important and complex issues of law are presented, a far more detailed exposition of argument is required to preserve an issue."); *Daggett v. Kimmelman*, 811 F.2d 793, 795 n.1 (3d Cir. 1987) ("[b]y failing to raise this issue in their original briefs, appellants simply did not appeal the district court's conclusion that these state defendants are not liable for counsel fees, and thus we do not consider this issue here"); *Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932 (3d Cir. 1976) ("[w]e generally refuse to consider issues that are raised for the first time on appeal"); *Carducci v. Regan*, 230 U.S. App. D.C. 80, 714 F.2d 171, 177 (D.C. Cir. 1983) ("[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them"); *see also* 16A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3974.1 (3d ed. 1999) ("to assure consideration of an issue by the court, the appellant must both raise it in the 'Statement of the Issues' and pursue it in the 'Argument' portion of the brief"). Questions concerning disenfranchised voters, new elections and the integrity of the

electoral process, impassionately asserted by the dissent,[14] though compelling, are not properly before the Court for review. Likewise, our review of the facts is limited to whether the record contains sufficient evidence to support the facts found by the trial court. *See Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91-92 (3d Cir. 1992). We do not review all the evidence presented at trial anew to discern whether such evidence supports additional claims that are not properly before us. The laws governing appellate review simply do not permit such judicial activism.

Returning to the merits of the Board's assertion, we agree that the trial court erred in deciding that laches did not bar Daniel's claim that the Board was required to certify him among the winners of the special election. In reaching this decision, the trial court drew a distinction between the ballot error, which could have been resolved with a pre-election challenge, and the Board's certification decision, which the court essentially found was not ripe for review until the Board certified the winning delegates. The court reasoned that the Board did not actually impose the "residency restriction" which limited the number of St. John delegates until it certified the winning candidates. Thus, the court ruled that, even though the ballot restricted voters to choosing only two St. John candidates, "nothing would have prevented the [Board] from certifying election winners based solely on the number of votes they received, regardless of their residency, if [the Board] had so desired." (J.A. at 11-12.) Because Daniel did not delay in contesting the Board's refusal to certify him as a delegate, the court concluded that laches did not bar his challenge to this decision.

■ For several reasons, we conclude that the trial court erred in failing to consider Daniel's election contest as a single claim. First, both Daniel's claim concerning the ballot and his claim regarding certification arose out of a single act of the Board: the June 2, 2007 decision to allow only two St. John candidates to be elected as delegates. What followed was but a series of necessary consequences of that decision. The Board changed the

---

[14] The dissent, in an effort to void the special election and order a new election would disregard entirely the equitable defense of laches by treating it as a minor issue pertaining to only one citizen, Harry Daniel. However, Harry Daniel is the only plaintiff in this case and only his claims as a candidate, not those of the voters or of anyone else, are before us in this appeal. The issues presented in this appeal are only those presented by the parties in their main briefs as stated at the outset of this opinion, each side inversely questioning the trial court's use of the defense of laches and the granting of mandamus relief.

ballot instructions to inform voters that they could only vote for two St. John candidates. The voting machines were reprogrammed to allow only two votes for St. John candidates. The special election votes were tabulated to determine which two St. John candidates received the highest number of votes. And finally, the Board certified the election results which, pursuant to June 2, 2007 decision, recognized only the top two St. John candidates as delegates. Each of these actions was inextricably linked to the June 2, 2007 decision, and we can discern no reason why the Board's certification of the election results should be dissected from that decision in the laches analysis.

 To the contrary, application of the laches defense in such a fragmentary manner defies the very rationale for imposing laches to bar inexcusably delayed claims. To hold otherwise "would effectively swallow the rule of laches, and render it a spineless defense." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001) (copyright infringement case where court refused to fragment laches into original release of movie and re-release of same movie). The mere threat of having a claim barred by laches is intended to discourage "sandbagging on the part of wily plaintiffs." *Soules*, 849 F.2d at 1180. "[F]ailure to require pre-election adjudication would permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.* (citations and quotation marks omitted).

 That was exactly the course of action taken by Daniel in this case. Daniel, by his own admissions at trial, became aware of his ballot claim one week before the election, yet chose to forgo a pre-election challenge and waited to see how the electorate would vote. "[I]f aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election." *Id.* (citations omitted). Daniel, without adequate explanation, failed to lodge his complaint before the election. Consequently, he is barred from the equitable relief of overturning the election results and being named a delegate to the Convention.

 We are unaware of any case in which an appellate court has addressed a trial court's decision to dissect the laches analysis in an election contest. Federal courts, however, have ruled that such a fragmented treatment of laches is inappropriate in a continuing tort context. In *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020,

1031 (Fed. Cir. 1992), the court recognized that "[l]aches is viewed as a single defense to a continuing tort up to the time of suit, not a series of individual defenses which must be proved as to each act of infringement, at least with respect to infringing acts of the same nature. To that extent, continuing tortious acts may be deemed to constitute a unitary claim." (citations omitted). Although we express no opinion as to whether laches may bar continuous tort claims in the Virgin Islands, because that issue is not before us, we believe the rationale underlying the application of laches in such cases is particularly relevant here. As the court pointed out in *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999), "[w]ithout the availability of the application of laches to a claim arising from a continuing wrong, a party could, theoretically, delay filing suit indefinitely. It would certainly be inequitable to reward this type of dilatory conduct and such conduct would necessarily warrant application of laches in appropriate circumstances." In like manner, if we were to affirm the trial court's analysis of Daniel's certification challenge in this case, future candidates could simply delay instituting an election contest until the election results are certified, even if they knew about the irregularity well before the election. Equity does not countenance such a result.

Accordingly, we conclude that the trial court erred as a matter of law by failing to hold that laches barred Daniel's claim that the Board was required to certify him as one of the thirty winners of the special election. The trial court's decision fails to recognize that the Board's certification of the special election winners was inextricably linked to its June 2, 2007 decision to limit the number of delegates who could be elected from St. John. Furthermore, the result reached by the trial court effectively strips the laches defense of its primary purpose in election contests of discouraging complainants from sitting on their rights while they await the election results. Equity barred Daniel's claim in its entirety. Having determined that the entire action is barred by the doctrine of laches, we must also conclude that the trial court erred in granting Daniel's petition for mandamus relief.

In reaching our decision in this case, we are cognizant of the importance of the special election for delegates and the task the elected delegates have before them in drafting a constitution for the Virgin Islands. This Court is also cognizant that the Board, in several respects, violated Act 6688. This opinion should not be interpreted as condoning

any violation of law. The Board and all election officials must pay close attention to the laws as enacted by the Legislature. For it is their duty as public servants of the people of Virgin Islands to ensure that all elections are conducted lawfully. We cannot forget, however, that the laws governing our adversarial system limit the types of claims which may be brought before our trial courts and the scope of our review on appeal.

In this case, Daniel inexcusably slept on his right to bring a ripe claim before the trial court, and several parties were prejudiced by his dilatory conduct. Under those circumstances, the doctrine of laches forbids a plaintiff from prosecuting the claim, and likewise prohibits both the trial court and appellate court from examining the merits of the claim. Thus, while we may acknowledge the importance of Daniel's claims, we cannot review the merits because the application of laches is not limited by the significance of the claimed deficiencies. Courts often allow election results to stand, notwithstanding significant legal infirmities. *See, e.g., Wells v. Rockefeller*, 394 U.S. 542, 547, 89 S. Ct. 1234, 1237, 22 L. Ed. 2d 535 (1969) (court found no error in permitting the election to proceed "despite its constitutional infirmities"); *Kilgarlin v. Hill*, 386 U.S. 120, 121, 87 S. Ct. 820, 821, 17 L. Ed. 2d 771 (1967) (court affirmed district court's action in permitting election to proceed, "although constitutionally infirm in certain respects").

## IV. CONCLUSION

For the foregoing reasons, we conclude that the trial court correctly applied the defense of laches to bar Daniel's claim that the ballot did not conform to the dictates of Act 6688. We disagree, however, with the trial court's ruling that laches did not bar Daniel's claim arising from the Board's failure to certify him as one of thirty winners in the election. The trial court should have considered Daniel's separate assertions as a single challenge to the Board's decision to limit the number of St. John candidates who could be elected as a delegate to the Convention. It is clear that laches barred the entirety of Daniel's challenge and the trial court's decision granting him relief will, therefore, be reversed.

## DISSENTING OPINION

SWAN, *Associate Justice, dissenting.*

In a democracy, a constitution is the paramount organizing document for a governmental structure. Therefore, the selecting of representatives to

write the constitution of the Virgin Islands is an auspicious occasion of the utmost importance. Because of the Joint Board of Election's egregious statutory violations and callous disregard of our election laws, which were pervasive and extreme, and which caused the special election to be conducted with an illegal ballot that disenfranchised *every* voter in the St. Thomas-St. John District participating in that election, I dissent.

I find that the issue of laches, which I will address later in the opinion, is a minor issue, pertaining only to one citizen, Harry Daniel. Even if Daniel is denied a delegate seat to the constitutional convention, the larger and more vexatious issue, which affects all voters in the St. Thomas-St. John District, as well as the legality of the election, will remain unresolved. As will become evident, the Joint Board of Elections' legal missteps have plunged the entire election process in the District into an abyss of illegality, which can only be rescued by a new election in the St. Thomas/St. John District.

## I. FACTS AND PROCEDURAL HISTORY

This matter emanated from the special elections (the "election" or "special election") held in the United States Virgin Islands on June 12, 2007 to elect delegates for the Fifth Constitutional Convention (the "Convention"). The controversy relates only to the sitting of candidates in the St. Thomas/St. John District. Harry Daniel ("Appellee" or "Daniel"), is a resident of St. John, United States Virgin Islands, a Virgin Islands voter, and a candidate for a seat in the special elections for delegates to the convention. Aggrieved that he was an unsuccessful candidate to the Convention, Daniel filed suit against the Joint Boards of Elections (the "Joint Board"), the St. Thomas-St. John Board of Elections (the "Board") and John Abramson, Jr. ("Abramson"), the Supervisor of Elections, (jointly, the "Appellants"). The special election was held pursuant to Act No. 6688 (2004 V.I. Sess. Laws 191) ("Act No. 6688" or the "Act").

In preparation for the June 12th, 2007 election of delegates to the constitutional convention, Appellants developed a ballot that listed all the St. Thomas-St. John candidates for district delegate in a single slate irrespective of the candidates' island of residency on either St. Thomas or St. John. The original ballot, a copy of which was entered into evidence by the trial court, instructed voters to select no more than thirteen (13) candidates, including no fewer than two candidates from the island of St. John. J.A. 84. This ballot was available for review by the candidates for

delegate to the convention. The ballot's language followed Section 1(d), subsection (2) of Act No. 6688 which explicitly provides in unambiguous language that:

> Thirteen delegates shall be elected from the district of St. Thomas-St. John, who shall be residents of either St. Thomas or St. John, *provided that not fewer than two delegates shall be residents of St. John.* (Emphasis supplied).

However, at a June 2nd, 2007 emergency meeting, and concerned about issues of ballot design, the Joint Board approved revisions to the ballot for the June 12th, 2007 special election. The meeting was attended by seven (7) members of the Joint Board who unanimously approved a single motion to make changes to both the at-large delegates' section of the ballot and the St. Thomas-St. John section of the ballot.

In the St. Thomas-St. John section of the revised ballot approved by the Joint Board, the candidates were segmented into two sections. Forty four (44) candidates, who are residents of St. Thomas, were listed in one section, with instructions to the voters to select no more than eleven (11) candidates. Similarly, the five (5) candidates, who are residents of St. John, were listed in another section of the ballot, with instructions to the voters to "select no more than 2" candidates. Thereafter, copies of the revised ballot were publicized in the mass media, but not forwarded to the individual candidates.

After the June 12 special election, the Board determined that Daniel received one thousand, seven hundred and fifty-three (1,753) votes. This amount of votes placed Daniel third among the St. John candidates, but eighth (8th) among the combined forty nine (49) candidates on both islands. The Board approved the two (2) candidates from St. John with the most votes from among the five (5) St. John candidates. The Board likewise approved the eleven (11) candidates from St. Thomas with the most votes for delegate. The day following the special election, Daniel discovered through the news media that the Board had determined that he was an unsuccessful candidate for the convention, because only two candidates can be elected from the island of St. John.

On June 15th, 2007, Daniel filed a complaint with Abramson, challenging the results of the election. Daniel's complaint was denied by the Board on July 10th, 2007. Daniel's administrative appeal of the

Board's denial of his complaint was likewise denied by the Joint Board on July 19, 2007.

On the same day, July 19th, 2007, Daniel filed a verified complaint against the Joint Board, the District Board, and Abramson, seeking *inter alia* a declaratory judgment, declaring him a winner in the special election of June 12, 2007, or alternatively, a declaratory judgment declaring the results of the special election for St. Thomas-St. John "null and void as being contrary to law." Because Daniel urged the trial court to declare the election "null and void and contrary to law", it is crucial that an examination be made to ascertain whether the applicable election laws were violated.

On July 20, 2007, the Superior Court granted a temporary restraining order against the swearing in of successful delegates to the convention. After a trial on July 27, 2007, the trial court entered its memorandum opinion and order ("order" or "trial court's order"). The trial court's August 13th, 2007 order granted Daniel's motion for mandamus relief. The trial court also ordered, *inter alia,* that (1) "pursuant to Act No. 6688 [Appellants] shall immediately certify the successful candidates for delegate to the Fifth Constitutional Convention according to the number of votes they received in the June 12 special election, without placing any upper limit on the number of St. John resident delegates", (2) "that [Appellants] shall swear in, or cause to be sworn in, these delegates forthwith, so that the Fifth Constitutional Convention may be convened as soon as possible", and (3) "[Daniel's] motion for preliminary injunction and declaratory judgment is **DENIED** as moot." *Id.* at 16.

On August 20, 2007, Appellants filed a notice of expedited appeal. On August 27th, 2007, Daniel filed a notice of cross appeal. On August 28th, 2007, this Court denied Daniel's motion to dismiss this appeal.

## II. DISCUSSION

### The Violations of the Election Law are Pervasive. Therefore, the Election Results are Void.

The predominant issue in this case is not about laches and its applicability to Daniel. Rather, the paramount issue is the Joint Board's several violations of Virgin Islands' statutory laws, causing the election to be illegal, while simultaneously disenfranchising all voters in the St. Thomas and St. John District. Additionally, the Joint Board's collective

violations of the statutory laws nullified not only the election but also the intent and will of the voters, whose interest is preeminent in any election.

## The Supervisor of Election is the Sole Authority under Act No. 6688 for Prescribing Ballots for the Special Election

The Joint Board's first violation commenced with it disregarding Act No. 6688's Section 1(g), which authorizes the special election to choose delegates to the Convention. Section 1(g) by stating that *"[t]he form of the special election ballot shall be prescribed by the Supervisor of Elections*; except that neither political party symbols nor political party designations may appear on any ballot." (Emphasis supplied).

The starting point for interpreting a statute is a determination of whether the statute's language plainly and unambiguously expresses its meaning. *See Massachusetts v. EPA*, 549 U.S. 497, 127 S. Ct. 1438, 1460, 167 L. Ed. 2d 248 (2007) ("[t]he statutory text forecloses [another] reading . . . [where] [t]he statute is unambiguous."); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 126 S. Ct. 2455, 2459, 165 L. Ed. 2d 526 (2006) ("[w]hen the statutory language is plain, the sole function of the courts at least where the disposition required by the text is not absurd is to enforce it according to its terms.") (internal citations and quotation marks omitted); *Dobrek v. Phelan*, 419 F.3d 259, 263 (3d Cir. 2005); *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001). Where the language of a statute is clear and unambiguous, there is no need to resort to any other tenet of statutory interpretation. *See, e.g., Massachusetts*, 127 S. Ct. at 1460.

There is nothing incomprehensible about the language in Section 1(g). Essentially, neither the Joint Board nor the Board had any authority to design the ballot for the special election. The authority to design or prescribe a ballot was consigned solely to the Supervisor of Elections. By designing the ballot at its June 2nd, 2007 meeting, the Joint Board unequivocally violated Act No. 6688 when it usurped a clear mandate by the Legislature, which mandate entrusted to the Supervisor of Election the sole authority to design the ballots for this special election. By a commonsensical reading of the statute, it is irrefutable that neither the Joint Board nor the Board was ever empowered or authorized to design a ballot for the special election. Importantly, the Supervisor did not attend the June 2nd Joint Board meeting.

To buttress the Act's provisions and make indisputably clear that Act No. 6688 supersedes all other similar election laws to the contrary, such as the current 18 V.I.C. § 451[1], the Act further instructs in Section 1(h), titled "Conduct of special election" that: "(1) *Except as otherwise provided in the Act*, the special election shall be governed by the election laws of the Virgin Islands, as provided under title 18 Virgin Islands Code, and all penalties provided by law shall apply to the special election." (Emphasis added). Therefore, Act No. 6688 supersedes 18 V.I.C § 451 and makes illegal the Joint Board's act of designing the ballot for the special election. *See Murphy*, 126 S. Ct. at 2459 ("[w]e have 'stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992)). *See also, Krauss v. Board of Election Commissioners of the City of Chicago*, 287 Ill. App. 3d 981, 681 N.E.2d 514, 516, 224 Ill. Dec. 199 (1997) ("[w]hen a special statute dictates the form of the ballot, there must be substantial compliance with the special statutory mandate or the election is void."). No where in Act No. 6688 does the law confer any role upon the Board or upon the Joint Board or empower or authorize either Board to create, design or configure a ballot for the special election.

Significantly, the person charged with prescribing the ballot, the Supervisor of Elections or Abramson, vehemently and vociferously took exception to the Board's illegal meeting. Abramson testified that he informed the Board members, both orally and in writing, that the Board's design of the ballot to be used in the June 12th, 2007 special election was done at an illegal meeting of the Joint Board. Tr. at 124-127. Abramson further testified that he also informed the Joint Board members that the Joint Board's action was taken without a quorum. However, the Joint Board's members callously ignored the advice from a reputable source, who is conversant with the administration of the Territory's Election

---

[1] Title 18 V.I. CODE ANN. § 451 provides:

All primaries and elections in the Virgin Islands shall be conducted by ballot. The Supervisor of Elections shall, prior to each primary and election, prepare the format of the ballot as it shall appear on the electronic voting machine in the form prescribed by this chapter under the direction of the District Board. Instructions on each official ballot shall be printed in both the English language and the Spanish language.

345

Laws, and proceeded precipitously on an illegal course of conduct.[2] Abramson is a sixteen-year veteran employee of the Election System of the Virgin Islands. Had the Board allowed the Supervisor to do his job of

---

[2] The questions are by Daniel's counsel or the Court. The answers are by Abramson.

Q: Is that the letter that you sent to Alicia Wells [Chairperson of the Joint Board]?

A: Yes, it is.

Q: Could you read what you told her in that letter?

A: It says, "Dear Ms. Wells, I am in receipt of Secretary White's letter of June 2, 2007 in which ballot changes were voted on by members of the Joint Board. The changes recommended will be implemented. However, I must bring to your attention that the June 2, 2007 emergency meeting did not have a duly-authorized quorum of eight and as such is not a legal meeting. If for any reason you have any questions or need additional information, please feel free to contact my office. . . .

Q: And was the letter cc'd to every member of the Board?

A: Yes, it was.

Q: So, they received a copy of that?

A: Yes, they did.

Q: Sir, how long have you been Supervisor of the Board of Elections?

A: Thirteen years.

A: Does the law prescribe what number constitute a quorum for the joint board?

A: The law prescribes that a duly-authorized quorum of he Board would be a majority and the majority of 14 is 8. That is in Title 18, Section 47.

. . . .

THE COURT: If I may, excuse me, sir. You have stated that you disagreed with the action of the board in revising the ballot?

THE WITNESS: Yes, I did.

THE COURT: But you did say that the revisions would be implemented.

THE WITNESS: That is correct.

THE COURT: Is there any reason why you disagreed with the actions of the Board and you also said that changes would be implemented?

THE WITNESS: I'm required by law. According to Title 18 Section 4, I'm and employee of the Joint Board of Elections and I'm required by Code to carry out their mandates as implemented, as directed, and that's the law.

THE COURT: Even mandates that are improperly enacted?

THE WITNESS: Well, I brought it to their attention. They had already made the action. So, I brought it to their attention that we are going to do what you said to do. I brought it to their attention that it was illegal and hopefully they would correct the problem. I could not undo what they had already done, and the need was a matter of time. . . .

346

ballot design, the voters would have received a legal ballot. Abramson informed the members of the Board of the illegality of their actions. Tr. 125. At that time, Abramson testified that there was enough time before the date of the election to change the ballots. *See* Tr. at 173.

Apparently, Abramson was unaware that Act No. 6688, promulgated only for the special election, gave him the sole authority to prescribe or to design the ballot. Despite his mistake, it is abundantly clear that Abramson disagreed with the Joint Board's members' belief that they had the authority at the meeting to design the ballot for the special election. Therefore, I conclude that Abramson, according to the trial transcript, never agreed or acquiesced in the Joint Board's illegal action of designing the ballot.

Even if the Joint Board eschewed the advice of Abramson, the Joint Board's members received notice that they had done something untoward. Unfortunately, even after being informed of the mistake, the Joint Board members did not believe that their mistake merited revisiting the issue by way of a special meeting to ascertain whether the Joint Board had the authority to design the ballot and to rectify the Joint Board's blatant violation of Act No. 6688.

### The Joint Board Changed the Ballot without a Quorum

The second violation of law accrued when the Joint Board held a Joint Board meeting on June 2nd, 2007, and designed the ballots, at a meeting that was illegal for conducting business, because the meeting lacked a quorum of eight (8) members.

Title 18 V.I.C. 47 (13) provides that a quorum of the Joint Board is a majority of the members of that board. This number is eight (8). However, only seven (7) members of the Joint Board were present at the meeting to adopt the ballot used in the June 12 special election. The Joint Board

---

THE COURT: Did you have authority as the Supervisor of Elections to over-rule any action taken if it was taken without a quorum.
THE WITNESS: No, I do not.
THE COURT: So, you are saying that the action of revising the ballot separate [and] apart from that that was done without a quorum is still an illegal action?
THE WITNESS: That is correct.

Tr. 124-127.

attempted to argue that the Joint Board met only to discuss the at-large seats, and that there was a quorum of four members for the Board to conduct business for the St. Thomas/St. John District, including to revise the ballots for that District. This argument is blatantly disingenuous. The minutes of the June 2nd, 2007 meeting confirm that it was a meeting of the Joint Board that was called and attended by members of the Joint Board. If the meeting was not a Joint Board meeting, but a meeting of only the St. Thomas-St. John District Board, why was it necessary to have members of the St. Croix Board of Elections, namely, Ana L. Davila, Jacqueline J. Heyliger and Dodson James, present and voting at the meeting on the ballot design change for the St. Thomas-St. John District? The ballot design was changed to reflect a maximum of eleven (11) delegates from St. Thomas and two (2) delegates from St. John.

The Joint Board's argument borders on mendacity. On Page 51 of the Joint Appendix is a document, admitted into evidence by the trial court, titled "Motion Roll Call Sheet" of "Meeting of the Joint Boards of Elections Held on 6-02-07" and concerns "motion [to] change ballot . . ." and mentions "11 residence [sic] and two residence [sic] of St. John." J.A. at 51. At the bottom of the page, there is a statement "to direct the Supervisor to comply with the wishes of [the] Joint Board". *Id.* The document reflects that only seven members were present. Additionally, in a June 2nd, 2007 letter, which was part of the trial record, Collette White-Amaro, Secretary of the Joint Board, wrote to the Supervisor of Elections. Her letter is unmistakably clear that,

> [a]t an emergency meeting of the Joint Board of Elections held on June 2, 2007, at the Election System's Office on each Island, a quorum being present; the Board voted on a seven to zero (7 to 0) vote that the existing special election ballot should be amended as follows . . . the St. Thomas-St. John district ballot should now reflect that each voter can and should be allowed to vote only for a maximum of eleven residents of St. Thomas, and for a maximum of two residents from the island of St. John.

J.A. at 86.

No legitimate business can be conducted by the Joint Board without a statutory quorum. Because the Joint Board is a fourteen (14) member board, a majority of its members, or a quorum, is eight (8) members.

348

Therefore, the Board's action of changing the original ballot at a meeting which lacks a quorum is illegal.

## In the Meeting without a Quorum the Joint Board Created Two Districts

The third violation of law is the Board's splitting of the ballot for the St. Thomas-St. John District to create two columns of candidates instead of one column, as mandated by Act No. 6688. Section 1(d) provides that "[t]he Constitutional Convention shall be comprised of 30 delegates, who shall be elected from the legislative district of the Virgin Islands, as established in title 2, Section 101, Virgin Islands Code." Specifically, Section 1(d)(2) of Act No. 6688 mandates that "thirteen delegates shall be elected from the district of St. Thomas-St. John." For the ballot to be legal, it must reflect a single district and not two (2) districts, one for St. Thomas and another for St. John.

The revised ballots separated the St. Thomas-St. John District candidates into two segments, one segment listed all of the candidates from St. Thomas with instructions to the voters to select no more than eleven (11), and the other segment listed all of the candidates from St. John with instructions to "select no more than 2" out of the five (5) candidates. This configuration of the ballot is flagrantly incongruous with Act No. 6688's provision of a "one district" concept. Therefore, the ballot is an illegal ballot.

## The Ballot Disenfranchised the Voters in the St. Thomas-St. John District

The fourth violation of the law is the most outrageous and directly disenfranchised all voters in the St. Thomas-St. John District. The ballot is inconsistent with the unequivocal and definitive language of Act No. 6688. There is nothing intricate, perplexing or incomprehensible about the simple and clear language of the Act. Section (1)(d)(2) expressly states: ". . . . provided that not fewer than two (2) delegates shall be residents of St. John . . ." This unambiguous language means at least two (2) delegates must be from St. John, and that legally, the voters in the District can vote for more than two delegates from St. John. The Joint Board inexplicably interpreted "not fewer than two delegates" to mean "not more than two delegates," which is an enormous difference, and erroneously so informed the voters in the District.

Even more egregious is that the instructions on the ballot prevented and foreclosed voters in the St. Thomas-St. John District from voting for three or four or five candidates of their choice who are residents of St. John, in blatant violation of Act No. 6688. The ballot likewise precluded or foreclosed some voters in the St. Thomas-St. John District from voting for more than two (2) candidates who are residents of St. John in violation of Act No. 6688. All voters were precluded from voting for thirteen (13) write-in candidates who are residents of St. John. In his testimony, Abramson testified that if a voter failed to follow the erroneous instructions on the ballot, the voting machine would not have allowed any voting inconsistent with the illegal instructions. Accordingly, unlike irregularities affecting the results from a single polling place, the illegal instructions on the illegal ballot were pervasive and affected the entire election at all polling places *and affected every voter* in this District. Essentially, the ballot used in this district is an illegal ballot and violated the clear intent, purpose and language of Act No. 6688. The unavoidable conclusion is that the election in the St. Thomas-St. John District was conducted with an illegal ballot; therefore, the election must be illegal. Illegality can only beget illegality.

The Joint Board's unauthorized effort to create a ballot is disastrous and replete with errors. Because of the illegal ballot, the voters were not only disenfranchised, but they were deprived of, and precluded from, exercising their lawful options. The following are lawful options from which the voters were precluded from exercising. These options are not mutually exclusive and are only some of the possible options that were available to all voters in the District:

 a. Voting for three (3) delegates who are residents of St. John and ten (10) or less delegates from St. Thomas.

 b. Voting for four (4) delegates who are residents of St. John and nine (9) or less delegates from St. Thomas.

 c. Voting for five (5) delegates who are residents of St. John and eight (8) delegates or less from St. Thomas.

 d. Voting by write in ballots for all thirteen (13) delegates who are residents of St. John.

 e. Voting by write-in ballots for 3, 4, 5, 6, 7, or 8 delegates, not exceeding thirteen (13), all of whom are residents of St. John.

 f. All voting options of any mathematical number of delegates from both St. Thomas and St. John on the ballots or write-in bal-

lots not exceeding thirteen delegates. Moreover, had the voter been given instructions consistent with Act No. 6680, their options would be innumerable, including a combination of write-in candidates on both islands in conjunction with the candidates on the ballot.

It must not go unnoticed that the illegal ballot punished those voters who voted in a manner consistent with the law, because the voting machines did not register those voters' legal votes. The voting machines were programmed to reject or preclude the voters' selection of candidates, even though the selections would have been legal.

## The Integrity of the Electoral Process is at Issue

The result of the election is that the thirteen (13) delegates to the Constitutional Convention from the St. Thomas-St. John District were elected by an illegal ballot or a ballot grossly inconsistent with Act No. 6688. The election cast a long sinister cloud over the legitimacy of thirteen (13) delegates to the convention. An illegal ballot can only beget an illegal election. The illegality in this case cannot be cured, nor can any action rectify the deficiencies, in the absence of a new election. As the Virgin Islands marches unrelentingly towards greater self governance, there is no comfort or solace in knowing that thirteen (13) delegates elected to write our constitution were selected by illegal ballots.

The legitimacy of thirteen (13) delegates is questionable, because of several lawful options the ballot foreclosed the voters from exercising when choosing the delegates. This case is a classical example of trampling upon the voters' rights. The Territory deserves better than the debacle, emanating from the selection of delegates in the St. Thomas-St. John District. In *Bryan v. Todman*, 1993 U.S. Dist. LEXIS 21461 at *21 (D.V.I. 1993), Judge Thomas K. Moore warned:

> . . . compliance with these statutory [election] provisions is not at the discretion of the election officials. The record is replete with evidence illustrating the rather "laissez faire" approach of the Joint Board of Elections to the statutory mandate. Both the Joint Board of Elections and the Supervisor of Elections have a statutory duty to conduct elections in accordance with the statutory mandate. This appellant failed to present evidence of a clear and convincing nature that the integrity

of the electoral process was affected by the numerous irregularities. We recognize, however, that such irregularities may, under other circumstances, result in subverting the free expression of the voters' will. Because of this concern, continued disregard of any statutory directives by the Joint Board of Elections will receive the closest scrutiny.

## But for the Pervasive Irregularities it is Reasonably Certain that the Results of the Special Election would have been Different

This is a case where pervasive irregularities have subverted the voters' will. But for the Joint Board's illegal ballot, it is reasonably certain that the results of the election would have been different. Five thousand, eight hundred and ninety seven (5,897) votes were cast in the St. Thomas-St. John District in the special election, and the number of votes separating winners from losers was close. Importantly, the difference in the votes between each of the top twenty (20) candidates from the next candidate immediately below each of the twenty (20) candidates, was less than four hundred (400) votes. In only one case, the difference was as high as 385 votes. In all other cases among the St. Thomas-St. John District candidates, the differences between candidates were less than 300 votes.

For example, the candidate with the highest vote in the elections received 2625 votes. The candidate following him received eighty one (81) votes less, or 2544 votes. The next candidate followed with 2159 votes, or 385 less votes. In scrutinizing the voting results for only the St. Thomas delegates, the conclusion is that only 131 votes separate the 11th place candidate in St. Thomas from the 10th place candidate, and a paltry 22 votes separate the 11th place candidate from the 12th place candidate. This means that the design of the ballot adversely affected the results of the election when the ballot's instructions restricted the voters' ability to exercise their full voting options. A further review of the election results for the St. Thomas candidates reveals that the 13th place candidate is separated by a miniscule 8 votes from the 12th place candidate, and only 46 votes from the 14th place candidate. Continuing with the St. Thomas candidates, there are only 19 votes that separate the 16th place candidate from the 15th place candidate, and 30 votes separate the 16th place candidate from the 17th place candidate in the St. Thomas-St. John District. A cursory review of the voting results among the top eighteen (18) vote getters on St. Thomas further buttresses the above statements.

| St. Thomas Candidates | Number of Votes | Rank by Vote |
|---|---|---|
| Myron D. Jackson | 2625 | 1st |
| Charles W. Turnbull | 2544 | 2nd |
| Lawrence "Larry" Sewer | 2159 | 3rd |
| Lois Hassell-Habtes | 2143 | 4th |
| Clement "Cain" Magras | 2073 | 5th |
| Stedmann Hodge, Jr. | 1790 | 6th |
| Thomas K. Moore | 1748 | 7th |
| Atty. Francis Jackson | 1710 | 8th |
| Wilma Marsh Monsanto | 1537 | 9th |
| Mr. Mario A. Francis | 1528 | 10th |
| Lisa Williams | 1397 | 11th |
| Lorna A.C. Thomas | 1375 | 12th |
| Rochelle M. Corneiro | 1367 | 13th |
| Tom Bolt | 1321 | 14th |
| Mark Hodge | 1301 | 15th |
| Carolyn Hermon-Percell | 1252 | 16th |
| Whitman T. Browne | 1252 | 17th |
| Merle Fenton | 1196 | 18th |

Considering that the ballot affects all votes that were cast in the District, and no more than four hundred and nine (409) votes separated the bottom four winners from the four top losers from St. Thomas, all of whom were vying for eleven (11) seats, had a legal ballot been utilized, there could have been a scenario where some winners would have been losers and some losers could have been winners. The following table illustrates that closeness of the election results, concerning the last four winners and the top four losers from St. Thomas.

| St. Thomas Candidates | Number of Votes | Rank by Vote |
|---|---|---|
| Atty. Francis Jackson | 1710 | 8th |
| Wilma Marsh Monsanto | 1537 | 9th |
| Mr. Mario A. Francis | 1528 | 10th |
| Lisa Williams | 1397 . | 11th |
| Lorna A.C. Thomas | 1375 | 12th |

353

| St. Thomas Candidates | Number of Votes | Rank by Vote |
|---|---|---|
| Rochelle M. Corneiro | 1367 | 13th |
| Tom Bolt | 1321 | 14th |
| Mark Hodge | 1301 | 15th |

The conclusion is inescapable that, had the ballot not unlawfully restricted the voters' choices, a different slate of winners and losers would have emerged. This result calls for a new election. *See Marks v. Stinson,* 19 F.3d 873, 889 (3d Cir. 1994) (to protect the integrity of the electoral process a new election is required if it is not feasible to establish the winners of an election).

## A New Election is Inevitable under these Facts

In *Boardman v. Esteva,* 323 So. 2d 259, 262-263 (Fla. 1975), the Florida Supreme Court expounded its standard for reviewing election results, which is often quoted by courts, including courts in this jurisdiction:

> At issue is whether the absentee voting law requires absolute strict compliance with all its provisions, or whether substantial compliance is sufficient to give validity to the ballot.
>
> We first take note that the real parties in interest here, not in the legal sense but in realistic terms, are the voters. They are possessed of the ultimate interest and it is they whom we must give primary consideration. The contestants have direct interests certainly, but the office they seek is one of high public service and of utmost importance to the people, thus subordinating their interests to that of the people. Ours is a government of, by and for the people. Our federal and state constitutions guarantee the right of the people to take an active part in the process of that government, which for most of our citizens means participation via the election process. The right to vote is the right to participate; it is also the right to speak, but more importantly the right to be heard.

*Boardman v. Esteva,* 323 So. 2d at 262-263; *see Goodwin v. The St. Thomas-St. John Board of Elections and John Abramson,* 43 V.I. 89, 98 (2000) (adopting and quoting *id.*).

354

Subsequently, in *Beckstrom v. Volusia County Canvassing Board,* 707 So. 2d 720, 725 (Fla. 1998) (also quoting *Boardman*), the Florida Supreme Court emphasized: "[w]e stress, however, that we are *not* holding that a court lacks authority to void an election if the court has found substantial unintentional failure to comply with statutory election procedures." In *Beckstrom,* another absentee voting case, the court explained that a court may invalidate an election due to unintentional wrongdoing where there was substantial non-compliance with election statutes regarding the ballot, and (2) that the non-compliance has resulted in reasonable doubt that the election reflected the will of the voters. *Id.* "By unintentional wrongdoing," the Florida Supreme Court wrote, "we mean noncompliance with statutorily mandated election procedures in situations in which the noncompliance results from . . . lack of care, or, as we find occurred in this election, the election officials' erroneous understanding of the statutory requirements." *Id.* For the judiciary to perform its role in a constitutional democracy, courts must safeguard the integrity of the electoral process and must flush out elections that frustrate the peoples' expression.

I am dismayed and flabbergasted by the testimony of a Joint Board member who attempted to justify the Joint Board's action. The member averred that the Board took the action it did in order to eliminate some inexplicable but perceived confusion with the original ballot. The member's testimony engendered unadulterated temerity and audacity. To be polite, I conclude that the only confusion in the illegal fiasco was the confusion concocted and generated by the Joint Board at the June 2nd, 2007 meeting.

The search for the validity of a ballot is the determination of the voter's intent. *See, e.g., Mcintyre v. Wick,* 1996 SD 147, 558 N.W.2d 347, 359 (1996); *In re McDonough,* 149 N.H. 105, 112, 816 A.2d 1022, 1028 (2003). Because the voter's intent is encapsulated in the ballot, the ballot is the kernel of our democratic system. A state may control the form and content of ballots as long as the right of franchise of the people is not destroyed. *See, e.g., Bachrach v. Secretary of Com.,* 382 Mass. 268, 275, 415 N.E.2d 832, 835 (1981).

Virgin Islands Courts deciding election challenges reflect that invalidating an election should be rare and for the most compelling reasons. In *Bryan v. Todman,* 28 V.I. 42, 45, 52 (Terr. Ct. 1992), the court explained:

"No court should invalidate an election and order a new one unless where there is a finding of fraud or deprivation of rights which would implicate the constitution of the United States, unless there is a clear statutory provision requiring it, *or unless violations of the statutory scheme were pervasive enough to affect or change the result of the election.* (Citations omitted) (emphases added).

Therefore, even in the absence of gross negligence (which does exist here) or fraud, an election marred by pervasive irregularities that affect the outcome of the election should not stand. *See Beckstrom v. Volusia County Canvassing Board*, 707 So. 2d 720 (Fla. 1998); *See also, Fouts v. Bolay*, 795 So. 2d 1116 (Fla. Dist. Ct. App. 5th Dist. 2001).

Because the Joint Board's pervasive violations of our election laws deprived the voters of their ability to choose candidates of their choice, no interpretation of law can make this election legal. "Even in the absence of fraud, where it was not feasible to establish who would have won a properly conducted election, a new election was appropriate to restore the integrity of the electoral process." *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994).

There is no other adequate remedy but to invalidate the election in the St. Thomas-St. John District and hold a new election. To invalidate an election, it must be proven by the complaining party that there was substantial non-compliance with election statutes regarding the ballot, and that this has resulted in reasonable doubt that the election reflected the will of the voters. *See Beckstrom*, 707 So. 2d at 725. The evidence of non-compliance with Act No. 6688 is overwhelming. Additionally, there is immense doubt whether the election reflected the will of the voters in the St. Thomas-St. John District. Obviously, the irregularities in the election affected the result of the election; therefore, the standard for setting aside an election has been met.

Provisions of election laws are mandatory, not directory, even after an election where statutory violations destroy the voters' will. *See, e.g., DeLeGal v. Burch*, 273 Ga. App. 825, 829, 616 S.E.2d 485, 489 (2005) (violations that "obstruct the free and intelligent casting of the vote, or the ascertainment of the result" are not cured by the election); *Floridians Against Expanded Gambling v. Floridians for a Level Playing Field*, 945 So. 2d 553, 565 (Fla. App. 1 Dist. 2006) ("a fallacious ballot language may be challenged and may be challenged after the election.") (Kahn, J.,

concurring in part and dissenting in part). Similarly, pervasive irregularities that obstruct the will of the voters cannot be substantial compliance with electoral law, especially where the design of the ballot ensures that the winners of an election cannot be ascertained. *See Bauer v. Souto*, 277 Conn. 829, 841, 896 A.2d 90, 97 (2006) (election invalidated where voting machine was defective and new election ordered because "[u]nder the circumstances of this case and this flawed election, only the first option [a new citywide election with all candidates participating] is consistent with the nature of elections in general and of this election in particular, as well as the democratic process.").

## III. THE DOCTRINE OF LACHES DOES NOT APPLY BECAUSE THE TRIAL COURT MADE NO FINDINGS OF FACT REGARDING THE REQUISITE PREJUDICE

### The Doctrine of Laches Applies where both Unreasonable Delay and Prejudice Resulting from the Delay are Present

The parties agree on the definition of laches. "The doctrine of laches focuses on one side's inaction and the *other's legitimate reliance* to bar long-dormant claims for equitable relief." *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 199-200, 125 S. Ct. 1478, 161 L. Ed. 2d 386 (2005) (referencing *Badger v. Badger*, 69 U.S. 87, 93, 17 L. Ed. 836 (1864)) (emphasis added); *see generally*, 27A AM. JUR. 2d *Equity* § 158 (1996 & 2007 update) ("[a]s a general rule, two elements are necessary to a finding of laches: (1) delay by a party in asserting a known right or claim, or, stated otherwise, lack of diligence, lapse of time, or failure timely to assert such right or claim; and (2) prejudice, injury, harm, hardship, damage, disadvantage, unfairness, injustice, inequity, or change of position, circumstances, or condition, *that is caused by or results from the delay*.") (Citations omitted) (emphasis supplied).

### There was No Finding of Prejudice Resulting from Daniel's Delay

"Prejudice" involves a change in position or some detrimental reliance. *Township of Piscataway v. Duke Energy*, 488 F.3d 203, 214 (3d Cir. 2007) (". . . the changing conditions of either or both parties during the delay" also must be considered) (internal quotation and citation omitted); *see In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 337 (3d Cir. 2004) ("[t]o establish prejudice, the party raising laches must demonstrate *that the*

*delay caused a disadvantage in asserting and establishing a claimed* right or defense; the mere loss of what one would have otherwise kept does not establish prejudice") (emphasis added). Even harsh consequences do not amount to prejudice, absent detrimental reliance. A trial court must make a factual record to determine the length of the delay, reasons for the delay, and how that delay changed a party's position. *Duke Energy*, 488 F.3d at 214.

Even in the election law context, where challenges must be effected expeditiously, courts have not yet dispensed with the required prejudice in laches jurisprudence.[3] In this case, *unlike any other election case involving laches cited by the trial court,* Abramson, the Supervisor of Elections, testified that the design ballot was contrary to law, Tr. at 122, that he informed members of the Board and Joint Board of the ballot's non-conformity with Act No. 6688, *Id.,* and that there was time to correct the illegal ballots, Tr. at 173-174, and the record reflects that he was ignored. Essentially, the proper inquiry is whether the Joint Board would have changed the ballot design if Daniel had timely complained to the Joint Board before the June 12th election. Based on the trial court's findings, and bolstered by the trial record, the answer is no.

To establish the defense of laches, Abramson, the Board, and the Joint Board must demonstrate that: (1) Daniel inexcusably delayed the assertion of a known right or his right to challenge the design of the ballots, and (2) that Abramson, the Board and the Joint Board were harmed or would have changed their position as a result of Daniel's delay. *See Benoit v. Panthaky*, 780 F.2d 336, 339 (3d Cir. 1985) (finding unreasonable delay, but no prejudice where precipitating tax sale was

---

[3] *See, e.g., Golden v. Government of the Virgin Islands,* Civ. No. 2005-5, slip op. at 10-11 (D.V.I. March 1, 2005) (prejudice to winning candidate where a candidate, not a member of that party, after the elections sought to be certified the winner of a seat reserved for a member of the Democratic Party); *Kay v. Austin,* 621 F.2d 809, 813 (6th Cir. 1980) (prejudice to government found where fringe presidential candidate was informed by state election director about timetable and ways for getting on the ballot, but candidate filed complaint after election preparation and ballot printing had commenced); *Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir. 1990) (prejudice found where candidate waited until election preparation and after absentee voting had commenced to mount challenge). Unlike *Kay* and *Fulani* where election officials were not warned about irregularities, ours has the *extraordinary* component of Abramson, the Supervisor of Elections, testifying that (1) the ballot was illegal, (2) that he alerted members of the Joint Board and, (3) that at the time he made this known, that there was enough time to reprint the ballots.

illegal and void); *Costello v. United States*, 365 U.S. 265, 282-284, 81 S. Ct. 534, 5 L. Ed. 2d 551 (1961) (finding no prejudice and no unreasonable delay, despite government's 27-year lapse of time before commencing proceedings, because of Costello's illegality, and teaching that a harsh consequence is not prejudice). The Board and the Joint Board were not prejudiced by Daniel's alleged tardy challenge to the ballot, because pursuant to Act. No. 6688, neither the Board nor the Joint Board had any authority to prescribe the ballot. What remains to be answered is whether Abramson's position would have changed, if Daniel had complained about the ballot before the election.

In its laches analysis, the trial court concluded that Daniel failed to assert his rights despite having notice of the ballot change. Order at 9. On the issue of prejudice, the trial court found that "Defendants are clearly prejudiced by Daniel's lack of diligence in challenging the format of the revised ballot, because if Daniel succeeds in his belated ballot challenge, a new special election would have to be held at great cost to the Territory." But, a critical analytical step was overlooked in the trial court's arrival at that conclusion. Ordering a new special election is a judicial remedy which presupposes that laches *has not been proven. See, e.g., Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176, 1180 (9th Cir. 1988) ("voiding of a state election is a 'drastic if not staggering' **remedy**") (quoting *Bell v. Southwell*, 376 F.2d 659, 662 (5th Cir. 1967) (emphasis added)).[4] It is not an element of laches.

---

[4] *See also id.* ("the equitable relief of overturning the results of an election."). It must be noted that although prejudice to the election winner was overwhelming, *Soules did not apply* "traditional laches analysis" and stated so. *Solues*, 849 F.2d at 1180 n. 7. Instead, the court assumed without analysis or discussion that its "considerations parallel those of traditional laches analysis." *Id.* In support of this extraordinary proposition, *Soules* cites to the laches elements outlined in *Costello*, 365 U.S. at 282. But *Costello* teaches us not to confuse consequences with the elements of the defense of laches. *Id.* at 283 ("[Costello] suffered no prejudice from any inability to prove his defenses. Rather, the harm he may suffer lies in the harsh consequences which may attend his loss of citizenship.") The Second Circuit Court of Appeals has declined to follow Soules. *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 261 (2d Cir. 1997) ("In any event, we find *Soules* unpersuasive in our case, particularly in light of the many cases recognizing that laches cannot bar legal relief under § 1983 . . ."). Subsequently, the Ninth Circuit Court of Appeals itself backpedaled on *Soules* starting from the court's standard of review. "*Soules* broadly stated that the district court's grant of summary judgment on the basis of laches is reviewed de novo. 849 F.2d at 1180." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 834 (9th Cir. 2002). "*Soules*," the Ninth Circuit continues, "made this statement in a single sentence with no further discussion or

Therefore, the exorbitant cost to the Territory of a new special election, while lamentable, is not an element of laches, absent that loss being caused by Daniel's failure to timely complain about the ballots.

The trial court made no finding as to whether Appellants' position would have changed had Daniel timely filed his complaint on June 2nd, 2007 or at any time thereafter. What is obvious is that a complaint from Daniel to Abramson, who had the legal authority to prescribe the ballot, would not have led to a change in the ballot's design.

### Ample Evidence Exists that a Complaint by Daniel before the Election would have been Futile

Daniel's complaint to the Joint Board before the election would have been a futile effort to get the ballot changed. To reiterate, the Joint Board and the Board had absolutely no lawful authority to change, to prescribe, to design or to configure the lawful ballot. The lawful authority to prescribe the ballot is reposed solely in the Supervisor of Elections. Therefore, how can the Board or the Joint Board be prejudiced by Daniel's purportedly untimely complaint about the ballot's configuration when neither the Board nor the Joint Board had any lawful authority to prescribe the ballot? Accordingly, any timely complaint by Daniel to the Joint Board about the ballot would be tantamount to a futile gesture and a colossal waste of time. Accordingly, any modicum of prejudice to either the Board or Joint Board, in this instance, escapes me. This conclusion is drawn from the trial transcript and is illustrated by the following colloquy between the Court and Abramson. The trial court's incorrect assumption that Act No. 6688 authorized the Board or the Joint Board to prescribe the ballot is the basis for this confusion. The following is a colloquy between the trial court and Abramson regarding the complaint procedures.

> THE COURT: If Mr. Daniel had challenged the ballot on June 2nd, could the special election have been stopped at the time?
>
> THE WITNESS: Could it have been stopped?

---

analysis." *Id.* Therefore, the Court clarified, "we do not read *Soules* to hold that all aspects of the district court's laches determination are reviewed de novo." *Id.* Because the Ninth Circuit's laches analysis similarly consisted of a single sentence in a footnote with no further discussion or analysis, reliance on *Soules* requires qualifications.

THE COURT: Yes, sir. Or would the ballot have been changed, or could—if you had received a complaint on June 2nd the ballot had been changed and was not in accordance with the law, could you have taken some type of action.

THE WITNESS: **No.** I would have to refer the matter to the Joint Board of Elections or the district Board of election depending on whether he is a district candidate, it would have went to the St. Thomas/St.John district Board of Elections for their action.

THE COURT: So, you would have referred it to the district Board of Elections if you would have received a complaint on June 2nd?

THE WITNESS: Correct.

THE COURT: And what action could the district Board have taken at that time?

THE WITNESS: The Board could have a ten day period in which to make any action whether they were going to change the ballot to stay as it was, give him a hearing, a multitude of actions they could have had at their avail.

Tr. at 172-173 (emphasis added).

Abramson reiterated that he would not have changed the ballot even if Daniel's complaint was presented to him before the special election. Questioned by the Board's counsel, Abramson stated:

COUNSEL: And just for clarification, you indicated that had Harry Daniel made a complaint you would have taken action, that action being forwarding the complaint, noting and forwarding the complaint to the respective Board; is that correct?

ABRAMSON: That is correct.

Tr. at 174.

From the trial transcript, it is undeniable that if Abramson had received a timely complaint from Daniel, he had no intention of changing the

361

ballot, even though he is the only one that was entrusted with that function under Act No. 6688. When the trial court asked Abramson directly whether he would have changed the ballot had Daniel filed his complaint before the special election, Abramson said "no." Moreover, Abramson responded repeatedly that before the special election, he would have referred a timely complaint from Daniel about the illegal ballots to the Board or Joint Board, which are entities not mentioned in Act No. 6688. Act No. 6688 does not permit Abramson to transfer Daniel's complaint to either Board. Consequently, how can Abramson be prejudiced by Daniel's complaint filed after the election if Abramson had absolutely no intention of addressing Daniel's complaint filed before or after the election?

Obviously, there is no prejudice to Appellants by Daniel's purported tardy complaint about the ballot. Therefore, I find the issue of laches to be a subterfuge which obfuscated the real issue in this case which is the Joint Board's illegal actions.

The United States Court of Appeals for the Third Circuit has opined that:

> [o]ur standard of review on the laches issue has various components. We review factual findings such as length of delay and prejudice under the clearly erroneous standard; we review the district court's balancing of the equities for abuse of discretion; and our review of legal precepts applied by the district court in determining that the delay was excusable is plenary. *See Churma v. United States Steel Corp.*, 514 F.2d 589, 592-93 (3d Cir. 1975).

*Bermuda Exp., N.V. v. M/V Litsa (Ex. Laurie U)*, 872 F.2d 554, 557 (3d Cir. 1989).

In this case, the trial court made no finding of fact *regarding how Daniel's unreasonable delay caused or would have caused Appellants to change their position regarding the design of the ballots.* Accordingly, the trial court did not balance the equities of Daniel's delay and Appellants' reliance thereupon. Instead the court assumed that "if Daniel succeeds in his belated ballot challenge, a new special election would have to be held at great cost to the Territory" demonstrated prejudice. This is clearly erroneous. Therefore, this Court cannot even review whether the trial court's balancing of equities was proper. The trial court confused the harsh consequence of a new election or the cost of operating another

election, a possible judicial remedy, with Appellants' detrimental reliance. Because the trial court failed to make a critical finding regarding an element of laches, *i.e.,* prejudice, and similarly failed to properly balance the parties' equities on the facts elicited at trial, I would reverse the trial court.

From the inception of the case, the trial court incorrectly assumed that:

> Defendants, the Virgin Islands Joint Boards of Elections ("Joint Board") and the St. Thomas-St. John Board of Elections (the "Board"), *both elected bodies within the Virgin Islands Government, are authorized pursuant to V. I. Code Ann. tit. 18 § 47 to regulate elections and to certify the result of elections.* Defendant John Abramson, Jr. ("Abramson" or "Supervisor Abramson") is the supervisor of elections and a servant of both the Board and the Joint Board. The Defendants were tasked by the Virgin Islands Legislature with conducting a special election for the delegates to the Fifth Constitutional Convention pursuant to Act No. 6688 (2004 V.I. Sess. Laws 191) (Act No. 6688).

J.A. at 4; Order at 2 (emphasis supplied).

However, Act No. 6688 did not empower either the Board or the Joint Board with "conducting" *any* special election, and no where in the language of the Act is the Board or the Joint Board mentioned. Significantly, Section (k) of Act No. 6688 states that "certification of election by the Supervisor of Election shall be conclusive with regard to the facts of their [delegates] election." I conclude that the certification of this special election is not by the Boards pursuant to 18 V.I.C. § 47, but by the Supervisor of Elections pursuant to Act No. 6688. The Act only authorized Abramson with conducting the special election. Act No. 6688's section (1)(h) ironically titled "conduct of special election" reads in full:

(1) Except as otherwise provided by the Act, the special election shall be governed by the elections laws of the Virgin Islands, as provided under title 18 Virgin Islands Code, and all penalties provided by law shall apply to the special election.

(2) Each candidate for delegate shall file a petition with the Supervisor of Elections signed by 25 qualified voters of the district in which the candidate will seek election, except that a petition for

363

the delegates-at-large must be signed by 25 qualified voters of any of the Virgin Islands election districts.

(3) All candidates for delegate whose valid petitions are filed with the Supervisor of Elections no later than 5:00 p.m., January 16, 2006, shall be listed on an official ballot as provided by the Supervisor of Elections.

To emphasize, Act No. 6688 does not mention or assign any role to the Board or Joint Board in the "conduct of [the] special election." Similarly, Act No. 6688 does not mention the Board or Joint Board *at all.* The trial court's incorrect assumption that there was a role for the Board and Joint Board in the special election was the sole impetus of his finding of laches against Daniel. Abramson would not have changed the ballot. Also, even if the Board or Joint Board would have changed the ballot, there is no authority in Act No. 6688 for such an action. Therefore, Appellants did not suffer any prejudice from Daniel's delay in not challenging the design of the ballot prior to the election. I conclude that the defense of laches does not apply in this case and Daniel's claim is not barred.

A possible explanation as to why Abramson would have referred Daniel's complaint before the election to the Board or Joint Board could have been 18 V.I.C. § 451 which states that "[t]he Supervisor of Election shall, prior to each primary and election, prepare the format of the ballot as it shall appear on the electronic voting machine in the form prescribed by this chapter under the direction of the District Board." However, Act No. 6688 changed that practice with respect to this special election.

In initiating this litigation, Daniel argued that the design of the ballots skewed the election and sought a new election as one remedy. Appellants argue in their Reply Brief that:

An election cannot stand if there is a possibility that the statutory violation influenced the outcome of the election or placed the result of the election in doubt. *Rizzo v. Board of Elections Commissioner of Revere,* 403 Mass. 20, 525 N.E.2d 409 (1998) (holding that unintentional clerical error of failing to designate a candidate as incumbent on ballot as required by law invalidated election). If the voters knew that they could have elected the five St. John residents that were listed on the June 12th ballot or that the St. John and St. Thomas residents were all competing together, the results could have been different. If the trial court's finding that the instructions on the ballot are inconsistent with

Act No. 6688 is correct, the error on the ballot would have deprived the voters of a full and free exercise of their franchise. The error on the ballot cannot be corrected simply be certifying Daniel as a winner, since it is impossible to determine with any degree of certainty that he would have received 1,753 votes or the eight highest number of votes had he competed with a full slate of St. Thomas and St. John resident candidates.

Reply Br. of Appellant at 13-14. This part of Appellants' arguments supports the call for a new election.

## IV. CONCLUSION

For the reasons elucidated above, I will reverse the decision of the Superior Court with instructions for the court to order a new special election only for candidates from the St. Thomas-St. John District to the Fifth Constitutional Convention of the Virgin Islands. Accordingly, I dissent.